# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | |
|---|---|
| GEORGE & COMPANY, LLC | |
| Plaintiff | |
| | Civil No. 1:07 cv 498 (LMB/TRJ) |
| v. | |
| IMAGINATION ENTERTAINMENT LIMITED, et al., | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE REPORT AND PROHIBIT TESTIMONY OF PLAINTIFF'S MARKETING EXPERTS

COME NOW Defendants Imagination Entertainment Limited, Imagination Holdings Pty Ltd. and Imagination DVD, Inc. (collectively, "Imagination") and present this Memorandum in Support of Defendants' Motion To Exclude Report And Prohibit Testimony Of Plaintiff's Marketing Experts and request that this Court exclude the report and testimony of Plaintiff's Experts, Jonathan D. Hibbard, Ph.D. and Scott D. Swain, Ph.D.  In support of their motion, Imagination states the following:

## STATEMENT OF FACTS

### I.      BACKGROUND

Imagination is a worldwide toy distributor based in Australia.[1]  Much of Imagination's business consists of repackaging generic games whose rights lie within the public domain and selling them as conventional dice or board games, or as interactive DVDs.  Unlike plaintiff, whose primary distribution chain consists of smaller specialty toy and novelty stores,

---

[1]  Defendant Imagination DVD, Inc., is a California corporation and a wholly owned subsidiary of defendant Imagination Entertainment Limited.

Imagination's distribution channels in the United States consist primarily of mass retail marketers.

At issue in this case is the name of Imagination's most recent dice game, "Left Center Right." The game itself is extremely simple. Each player begins the game with an equal number of chips. The players take turns throwing three dice. Each six sided die has a face with an "L," a "R," and a "C;" the remaining three faces all have a dot. The thrower is required to pass to the player to his left the number of chips equal to the number of die that come up "L," and to the player on his right on the number of chips equal to the number of die to come up "R." If any the dice comes up "C," the thrower must pay up to a center pot the number of chips equal to the number of dice that show C. Any die which come up with the dot is neutral and no chips are passed with respect to those dice. The game continues until only one player is left with chips; that player is entitled to the chips in the center pot and is declared the winner.

Although plaintiff George & Co., LLC ("George" or "plaintiff") calls its version of the same game "LCR", it asserts in this case that it owns four trademarks associated with this game: (1) LEFT CENTER RIGHT; (2) LEFT, CENTER OR RIGHT – DON'T LOSS YOUR CHIPS!; (3) LCR; and (4) the letters "LCR" combined with a "rolling-dice design." Complaint ¶ 12. Of those four marks, plaintiff recently applied for and received federal trademark registrations for the two marks that involve LCR (numbers 3 and 4 above).[2] Complaint ¶ 17. In contrast, purported marks (1) and (2) were not registered and plaintiff relies on them solely as common-law trademarks.

---

[2]   Since learning of Imagination's intent to introduce its game under the name Left Center Right, plaintiff filed for trademark registration of the purported mark number two, above, "LEFT, CENTER OR RIGHT – DON'T LOSE YOUR CHIPS!"  and an illustrative design demonstrating the play of the game.  To date, it has not applied for the mark "LEFT CENTER RIGHT."

While defendants acknowledge plaintiff's registered marks of LCR and LCR combined with the rolling dice design, defendants dispute that plaintiff owns or uses LEFT CENTER RIGHT as a trademark and further assert that defendants' use of LEFT CENTER RIGHT does not infringe on any trademark owned or used by George.  Since George does not claim in this case that defendants' sale of the game, standing alone, is wrongful or infringes on any intellectual property rights owned by George, the sole issue presented is whether Imagination's use of the term LEFT CENTER RIGHT infringes on any of George's protectable intellectual property rights.

## II.    PLAINTIFF'S MARKETING EXPERTS.

Under the terms of the Scheduling Order in this matter, plaintiff's expert witness designations and reports were due to be served on defendants no later than August 15, 2007.  On that day, plaintiff served on defendants what purported to be two expert witness reports; one report was by Gary D. Krugman, Esquire, a practicing attorney who is a former Trademark Examining Attorney and Administrative Trademark Judge.  Mr. Krugman's opinion focuses solely on the treatment of trademark applications at the Examining Attorney level of the PTO and how that process might be applied to defendants' application and plaintiff's applications filed after it learned of the existence of defendants' application.  While defendants have serious concerns over the admissibility of this report and Mr. Krugman's testimony, the sufficiency of his report and the adequacy of the disclosure are not at issue in this motion.

The second report, authored by Jonathan D. Hibbard and Scott D. Swain (collectively also referred to as plaintiff's "Marketing Experts"), however, presents a different issue.  Doctors Hibbard and Swain, who characterize themselves as "experts and scholars in marketing," have

3

submitted a report which is materially deficient in meeting the requirements for an expert witness report as set forth in Fed. R Civ. P. 26(a)(2)(B).

Hibbard and Swain's original report, dated August 15, 2007, entitled, "Re: Dice Game Assessment and Analysis" ("Hibbard-Swain Report", a copy of which is filed here with as Exhibit A) purports to provide the substance of the Marketing Experts' testimony as to two apparently different areas.  First, plaintiff expects Drs. Hibbard and Swain to testify that "the names 'LCR' and 'Left Center Right,' as they are used by George & Co and appear in the marketplace are likely to be perceived by consumers/trade partners and potential consumers/ trade partners as distinct, interchangeable brand names/identifiers of source and associated with the George & Co dice game."  Exhibit A, Hibbard-Swain Report, at 1.   Second, plaintiff anticipates Hibbard and Swain testifying that the "marketing mix" comparative analysis of "product, price, place, promotion" leads to the conclusion that the "marketing of the Imagination Holding's dice game significantly overlaps with the marketing of George & Co's dice game." Exhibit A, Hibbard-Swain Report, at 1.

The primary difficulty with this report is that the authors failed to provide both a "meaningful or complete statement of the bases and reasons" for their opinions and a meaningful identification of "the data or other information considered" in forming their opinions.  Rule 26(a)(2)(B).  On August 20, 2007, defendants' counsel wrote to plaintiff's counsel with respect to a number of deficiencies in plaintiff's discovery responses, including deficiencies contained in the Marketing Expert Report .  In response that letter, on August 23, 2007, plaintiff submitted a "Revised" report by Hibbard and Swain (copy of which is attached hereto as exhibit B).[3]  In that

---

[3]   The revisions to this new report consisted of additional information known to the authors at the time they wrote the original report.  Not only does the plaintiff provided no explanation for why this material was not originally included in the original August 15 report, the plaintiff did not seek leave from this Court to supplement or revise this report after the date due pursuant to the Scheduling Order.

revised report, provided eight days after plaintiff's expert reports were due, Hibbard and Swain provided an identification of the websites they visited, retailers to whom they telephoned and the identification of six retailers whom they physically visited.  In addition, they provided a grid analysis (Appendix E to the Revised Report) entitled "Comparison of Marketing Mix and Related Elements for George & Co.'s Dice Game and Imagination Holdings Dice Game."

Although the Revised Report provides more information than that contained in the original report, plaintiff's Marketing Experts' Report, even after the revision, still fails to provide the minimum information required by Rule 26(a)(2)(B).  This failure is particularly troublesome because it appears that the findings are based, at least in part, on telephonic and in person interviews of retailers and consumers.  However, the experts failed to disclose: (1) the basis for selection of the stores telephoned and visited; (2) any information concerning how many people they interviewed and the mix between retailers and consumers; (3) the questions asked and the responses given in those interviews; (4) any categorization, classification or analysis of the responses received; and (5) any indication that these interviews constitute a sufficient sample to establish the this testimony and report would meet the requirements of F. R. Evid. 702 or allow this Court to exercise its gatekeeping function "... as to whether that reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the fact at issue."  *Daubert V. Merrill Dow Pharmaceuticals, Inc.,* 509 U. S. 579, 592-593 (1993).

### A. The Report Fails To Provide the Basis for the Conclusion That "LCR" And "Left Center Right" Are Interchangeable in The Public's Mind.

As to the conclusion that plaintiff's alleged use of "LCR" and "Left Center Right" establishes a connection such that the terms are interchangeable in consumers' and retailers' minds, Hibbard and Swain claim that plaintiff's use of the mark LCR causes a consumer to try to

5

find an association to the random letters and therefore associate LCR with Left Center Right. Revised Marketing Report, Exhibit B, at 2-4.  However, they provided no factual basis to support this assertion and failed to disclose the methodology in sufficient detail to allow this Court to determine whether there is a sufficient basis to meet the reliability requirements of *Daulbert*.

For instance, Hibbard and Swain asserted, "George & Co.'s dice game is identified by its game components ("e.g., dice and chips") and game rules as well as by the distinct names 'LCR' and 'Left Center Right' and associated text copy, packaging, colors, and visuals."  Exhibit A at 1.  Yet, even though a critical issue in this case is whether plaintiff uses "Left Center Right" as a trademark, nowhere do the Marketing Experts discuss or explain how George & Co.'s game is identified by the allegedly distinct name "Left Center Right."  Nor do they provide any example the usage of that allegedly distinct name by plaintiff.  Rather they simply assume the thing to be proven by asserting that plaintiff's game is identified by that name.

The marketing experts then spend virtually all of pages 2 and 3, as well as the beginning of page 4, discussing the theoretical method for processing brand names which appear as acronyms, but provide no substantive information as to the underlying basis for their conclusion that there is a "mental branding association or connection between 'LCR['] and 'Left Center Right' such that they are considered as distinct, interchangeable or 'one and the same' in consumers' minds (and retailers' minds) in identifying the source of the market offering."  *Id*. at 5.  In providing that opinion in their original report, they did not:

- Explain their understanding of plaintiff's "use and co-presentation of "LCR" and "Left Center Right" in the marketplace…."  *Id*. at 4.

- Identify the game retailers to whom they placed telephone calls or the name of the stores which they allegedly visited.[4]

- With respect to the retailers to whom they telephone or visited, disclose to how many people they spoke, the mix between retailers and consumers, the questions asked, the responses provided, the size of the sample, any of the factors which would indicate that the sample and questions asked were statistically reliable and whether there is an established margin of error with respect to any their findings.

Moreover, even in the "Revised" Report, provided eight days after plaintiff's expert reports were due, they still failed to provide the basis for the selection of the locations, websites or persons contacted and failed to provide any information with respect to the samples of persons contacted or interviewed which support of their opinion.  Hibbard and Swain merely opine that the terms are interchangeable in consumers' and retailers' minds, without providing sufficient

---

[4]   On August 21, 2007, plaintiff's counsel responded to defendants' counsel's August 20, 2007 letter regarding deficiencies in plaintiff's responses to the defendants' Interrogatories and Marketing Experts' Report.  In that correspondence, counsel identified 18 websites the Marketing Experts visited in addition to the Amazon.com website identified in the Report. August 21, 2007 letter from Mark Summers, Esquire, attached hereto as Exhibit C, at 3.  In addition, counsel's letter specifically identified six stores, included in those which the Report's authors telephoned or visited (of the six stores, one was Toys "R" Us and they, according to counsel, visited three of their stores) for a total of eight disclosed locations visited either in person or by phone. All but one of the eight locations is located in Massachusetts; the remaining location is in Fergus Falls, Minnesota.  *Id*. at 4.

As noted above, on August 23, 2007, Plaintiff Provided a "Revised" Marketing Report, in which they added Appendices B and C which were not in the original report.  Appendix B contains webpages from 22  Websites and Appendix C contained material from eight websites with 'consumer generated content' purportedly to show "... how commonly shown or used the initialism 'LCR' and the name "Left Center Right" word order to further verify our analysis..." Exhibit B at 4.  The Revised Report also identified approximately 49 stores or locations the authors telephoned and six locations, all of which are in Massachusetts, which they physically visited, as opposed to the eight total locations disclosed in counsel's letter only two days earlier.

information to understand the basis for that opinion or the methodology used to reach that opinion.

As to the conclusion that the marketing of Imagination's and plaintiff's games overlap, Hibbard and Swain, in their original report, merely list four elementary marketing terms – product, price, place and promotion.  Exhibit A, Hibbard-Swain Report, at 5.  Then Hibbard and Swain mention examples of "sub-elements" such as "distribution channel members and sales channels" for "place."  Exhibit A, Hibbard-Swain Report at 6.  But their Report does not describe any specific distribution channels or sales channels relevant to Imagination or plaintiff.  Instead, Hibbard and Swain list out these examples of "sub-elements" and conclude, with no detail or supporting facts provided, that "there is significant overlap in the target market and marketing mix elements and sub-elements" of Imagination's game and plaintiff's game.  Exhibit A, Hibbard-Swain Report, at 6.  Surprisingly, Hibbard and Swain opine that the marketing of Imagination's game "significantly overlaps" with the marketing of plaintiff's game without providing any information as to where that overlap occurs, how they determined the existence of the overlap, or how they quantify the term "substantial".

In the "Revised" Report, the Marketing Experts provided an eight page grid analysis comparing George & Co.'s Dice Game and Imagination Holdings Dice Game and conclusions they draw from that comparison.  While some of the information contained in the newly added grid is objective and the source easily determined (for instance, at page 2 of Appendix E, they describe the physical attributes of the dice, tokens and game set of both games), much of the information contained in the grid is purely subjective or the authors failed to provide any basis from which they formed their conclusion.  For instance, the authors conclude that the consumer's decision-making and buying process for both plaintiff and defendants' games "would likely be

characterized by a limited decision-making effort and unplanned or impulsive purchasing." Exhibit B, Appendix E. at 8.  Regardless of the merits of that assertion, the authors fail to provide any basis for how they came to that which seems, at best, to be a tentative conclusion. The reader of the report and appendix has no idea of whether this conclusion was the result of consumer or retailer interviews or some other undisclosed source.

Even when they noticed substantial differences between the products, they blurred those distinctions in their conclusions without providing a basis for that blurring.  For instance, in discussing the target market coverage, they correctly noted that plaintiff markets its game through "thousands of small retailers and on the Internet." *Id*. at 6.  The also properly noted that defendants "dice game is marketed to mass retailers, e.g. Toys "R" Us, Wal-Mart, Target, K-Mart, Best Buy, Circuit Cit[y], RadioShack, and on the Internet."  *Id*.  However their conclusion asserts "With maximum penetration of respective distribution channels by both parties for their dice games, George & Co.'s target market coverage would clearly exceed Imagination Holdings' target market coverage."  *Id*.  Not only is there no basis provided for that conclusion, there is no indication of when they would expect either Georgia & Co. or Imagination Holdings to reach maximum penetration of their respective distribution channel and how the all commodity volume would be balanced between these respectfully different markets during that interim period.

This is not merely at a theoretical nitpick.  Plaintiff has been selling its game among thousands of small retailers for nearly 20 years and on the Internet for a substantial period.  Yet, it apparently has not yet reached its "maximum penetration of [its] distribution channels" and there is no indication of how close they are to reaching that maximum penetration.  Furthermore, Imagination Holdings is only just now beginning to introduce this product to the mass retailer market, a market segment which plaintiff has been unable to penetrate over the last 20 years.

Since the authors give no basis for their conclusion as to what may happen when they both reach their maximum penetration, one cannot determine from their analysis the dynamic and its significance while George & Co. approaches its maximum penetration (assuming that it is) and Imagination Holdings' new entry into its mass retailer market.

Similarly, in discussing the place of distribution, the authors recognize that the parties use some common and some different distribution channels. *Id*. at 5. However, they provide no input on the significance of the different channels and whether, in their comparison mix, they weighed these distribution channels by profitability, volume, gross sales or any other variable which would reflect the relative importance of any single distribution channel to either party and the significance of either any overlap or any separation between the most important distribution channels for each party. They acknowledged a significant pricing difference between plaintiff (in-store retail from $5.99 to $7.00, and online retail from $2.05 to $7.99) and defendants (in-store retail from $16.99 to $19.99, and online retail for the same prices), but then failed to discuss the significance, if any, between the gross disparity in pricing. *Id*. at 5.

The authors also nakedly assert that "George & Co. uses the names 'LCR' and 'Left Center Right' interchangeably to identify their dice game product in their marketing materials." *Id*. at 4. Yet, nowhere do they provide any George & Co. marketing materials which would demonstrate this alleged interchangeable use of the two names. In their description of the "Use of colors, text and visuals," they describe a variation of plaintiff's packaging which refers to the game as "LCR" within a dice design, and on which the phrase "Left, Center or Right – Don't lose your chips!" and an illustration of gameplay in which the words left, center and right appear beside arrows showing the movement of a chips consistent with the depiction of dice showing L,

R and C. *Id*. at 4.  They neither describe nor provide any other George & Co. marketing material

and do not even have the George & Co. webpage included in their Revised Report.

## ARGUMENT

### I.      INTRODUCTION AND STANDARD OF PROOF

Hibbard and Swain's report fails to disclose the basis and reasons for their opinions and

the data and information considered in forming their opinions. Even if plaintiff disclosed the

required information, this Court, through its gatekeeping functions, should nonetheless exclude

Hibbard and Swain's report and testimony as they have failed to provide the facts or evidence

from which this Court can determine if they used a reliable methodology in reaching their

opinion.

The question of whether expert evidence is admissible lies within the sound discretion of

the trial court and must be upheld absent abuse of discretion.  *See e.g. Persinger v. Norfok &*

*Western Railway Co.*, 920 F.2d 1185 (4th Cir. 1990).

### II.     THIS  COURT SHOULD EXCLUDE HIBBARD AND SWAIN'S REPORT AND TESTIMONY PURSUANT TO RULE 37 (C)(1), BECAUSE IT FAILS TO PROVIDE INFORMATION REQUIRED UNDER RULE 26(a)(2)(b)

Hibbard and Swain's report makes two broad conclusions that plaintiff's "LCR" mark

and alleged "Left Center Right" mark are likely to be perceived as distinct and interchangeable

brand names, and that the marketing of Imagination's dice game and plaintiff's dice game

significantly overlap.  Exhibit A, Hibbard and Swain Report, p. 1.[5]  Because the report falls fair

---

[5]   Defendants believe that this Court ought to determine the admissibility of Hibbert and Swain's
report and testimony on the basis of the original report provided on August 15, 2007 pursuant to
the deadline established in the Scheduling Order, particularly in light of the fact that they did not
seek leave of the Court to extend that deadline or  to file the Revised Report.  Had they done so,
they would been obligated to provide the Court with an explanation of why the new material in
the Revised Report was omitted from the original report even though it was in their possession.

short of the level of completeness required by Rule 26 (a)(2)(B), this Court should exclude

Hibbard and Swain's report and testimony.  Specifically, the report fails to give the basis and

reasons for the opinions, the data and information considered in forming those opinions, and the

exhibits to be used as a summary of or support for the opinions.  Additionally, this Court should

exclude Hibbard and Swain's report and testimony because these sweeping conclusions merely

state legal conclusions and are based on nothing more than commonly expressed principles.

Rule 26 requires the proponent of expert testimony to serve the opposing party with a

detailed expert report, containing:

> [1] a complete statement of all opinions to be expressed and [2] the basis and
> reasons therefor; [3] the data or other information considered by the witness in
> forming the opinions; [4] any exhibits to be used as a summary of or support for
> the opinions; [5] the qualifications of the witness, including a list of all
> publications authored by the witness within the preceding ten years; [6] the
> compensation to be paid for the study and testimony; and [7] a listing of any other
> cases in which the witness has testified as an expert at trial or by deposition
> within the preceding four years.

Fed. R. Civ. P. 26 (a)(2)(B).

Sanctions for violating Rule 26 (a) can be severe, in that a

> party that without substantial justification fails to disclose information required by
> Rule 26 (a) or 26 (e)(1), or to amend a prior response to discovery as required by
> Rule 26 (e)(2), is not, unless such failure is harmless, permitted to use as evidence
> at a trial, at a hearing, or on a motion any witness or information not so disclosed.
> In addition to or in lieu of this sanction, the court, on motion and after affording
> an opportunity to be heard, may impose other appropriate sanctions.  In addition
> to requiring payment of reasonable expenses, including attorney's fees, caused by
> the failure, these sanctions may include any of the actions authorized under Rule
> 37 (b)(2)(A), (B) and (C) and may include informing the jury of the failure to
> make the disclosure.

Fed. R. Civ. P. 37 (c)(1).  The sanctions authorized under Rule 37 (b)(2) include:

---

However, even if this Court were to measure plaintiff's compliance with Rule 26(a)(2)(B)
against the Revised Report, the report and their testimony should still be barred for failure to
comply with the standards for disclosure contained in Rule 26.

(A)  An order that the matters regarding which the order was made or any other designated facts shall be taken to be established  for the purposes of the action in accordance with the claim of the party obtaining the order;

(B)  An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

(C)  An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

Fed. R. Civ. P. 37 (b)(2); *accord United States v. Barile*, 286 F.3d 749, 758-759 (4th Cir. 2002) (exclusion of testimony is proper remedy for failure to give bases and reasons for expert's opinions under similar Federal Rule of Criminal Procedure 16 (d)(2)).

Hibbard and Swain's original report falls far short of the level of completeness required by Rule 26 (a)(2)(B).  Namely, the Report fails to state the basis and reasons for the opinions, the data or other information considered by Hibbard and Swain in forming the opinions, and the exhibits to be used as a summary of or support for the opinions.  As only one example regarding the first conclusion that plaintiff's alleged marks are interchangeable brand names, Hibbard and Swain claim to have visited locations where consumers might purchase or encounter dice games, and to have called game retailers.  Exhibit A, Hibbard and Swain Report, p. 4.  However, in the original report, plaintiff failed to provide any information about these visits and calls.

Moreover, while they claim to have interviewed retailers and consumers, the report, even as revised, fails to provide any information with respect to whom they spoke, the mix between retailers and consumers in their interviews, the subject of the interview, the person who designed the questions used in the interview, the questions actually used, the responses received and whether the population of retailers and consumers interviewed were sufficiently representative so as to constitute a reliable sampling.  The authors assert:

> The purpose of our information gathering was to ascertain the overall marketing context in which the dice game products, *as seen or experienced by consumers/trade partners and potential consumers/trade partners*, are situated [sic] to ensure the applicability of the marketing and behavioral science concepts discussed above.

"Revised Report", Exhibit B, at 5 (emphasis added).  They go on to state: "Our findings from reviewing websites, calling retailers, and visiting retail stores, along with the materials provided to us, indicate that George & Co.'s branding and marketing communications has [sic] presented its dice game product offering with both the initialism "LCR" and the corresponding name "Left, Center, Right" as brand names (as opposed to generic references for the type of game)."  *Id*.

This sweeping finding, cutting to the very essence of the case, is virtually unexplained. They do not discuss what they found in the websites to support this conclusion, including which, if any, of these websites contained any George & Co.'s "marketing communications."  As discussed above, they provide no information of the substance of the telephone calls with the retailers, including how many actually carried either plaintiff or defendants' versions of the game, or if the persons called were familiar with either "LCR" or the name "Left Right Center." Moreover they provide no information to support the assertion that "Left Right Center," coupled with "LCR" act as "... distinct brand names in the *consumer's mind*."  *Id*. in fact, they provided no information at all with respect to any communications with consumers, let alone information supporting that conclusion.

While Hibbard and Swain talk about plaintiff's use of "Left Center Right," nowhere do they analyze that usage or discuss in what manner they believe plaintiff uses that term as a brand rather than as a descriptive phrase for the game.  They do not discuss that the term "Left Center Right" is never used in isolation on plaintiff's packaging, but only as part of the tagline "Left, Center, or Right – Don't lose your chips!" and embedded in a graphic display showing the chips

moving to the left, center or right following the face of the dice depicted.  They do not discuss that, on plaintiff's website, the game is consistently and solely referred to as "LCR."  They do not discuss plaintiff's conscious decision to register as a trademark LCR and LCR contained in a rolling dice design, and not to seek trademark protection for LEFT CENTER RIGHT.  Rather, in their Introduction, the authors have already assumed their conclusion, "George & Co.'s dice game is identified by its game components... and game rules as well as by the distinct names "LCR" and "Left Center Right" and associated text copy, packaging, colors and visuals."  *Id*. at 1.

Moreover, regardless of the merits of Hibbard and Swain's "marketing and behavioral science concepts" (*Id*. at 5), the ultimate premise of the association between LCR and Left Center Right turns the concept of trademarks on its head.  As this Court is well aware, trade mark law recognizes a continuum of concepts ranging from generic to descriptive to suggestive to arbitrary. A generic name for a product or service, while usually associated by the public, to that good or class of goods is not entitled to trademark protection.  Similarly, a name which is descriptive of the product or service is also not entitled to trademark protection unless it has achieved a secondary meaning separate from its descriptive function.  Suggestive marks, such as abbreviations, are protectable because they do not describe the product or the service, in and of themselves.  Arbitrary, or fanciful, marks are the most easily protected because they have no relation to the product or service to which they are attached.  2 McCarthy on Trademarks and Unfair Competition § 11:2, at 11-5 – 11-9 (2007).

Yet, Hibbard and Swain seem to find that the plaintiff's usage of LCR reinforces its ownership of the mark Left Center Right because of the need for a consumer to attach a phrase or name to an initialized mark.  Revised Report, Exhibit B, at 3.  "Second, the initialism 'LCR' is

likely to trigger consumers to search for the meaning of these three letters, thereby establishing a strong semantic relatedness between 'LCR' and 'Left Center Right.'  This semantic relatedness will further strengthen the associative branding link between 'LCR' and 'Left Center Right' in consumers' memory."  *Id*.at 5.

Even if the Court had a sufficient basis upon which this conclusion could be founded, it is irrelevant to the legal concept of whether Left Center Right is generic or merely descriptive.  At best it leaves open the issue of whether LCR is in fact also descriptive because of the immediate link of the consumer to unscramble the initials into the generic/descriptive term "Left Center Right."

III.   **THE MARKETING REPORT'S FAILURE TO COMPLY WITH THE RULE 26 (A)(2)(B), EVEN AS REVISED, RENDERS IT IMPOSSIBLE FOR THIS COURT TO EXERCISE ITS GATEKEEPER RESPONSIBILITIES UNDER DAUBERT.**

A.   **The Marketing Experts' Report Fails to Provide the Basis and Reasons for Their Opinion or the Data and Other Information They Considered In Forming their Opinions with Respect to the Branding of "LCR" and "Left Center Right."**

Hibbert and Swain reviewed Internet webpages, telephoned a number of retail stores, visited the few retail stores located mostly in Massachusetts and, presumably, spoke to retailers and/or consumers during those visits.  As a result, "[o]ur findings from reviewing the websites, calling retailers, and visiting retail stores, along with the materials provided to us, indicate that George & Co.'s branding and marketing communications has presented its dice game product offering with both the initialisms 'LCR' and the corresponding name 'Left, Center, Right' as brand names (as opposed to generic references are the type of game).  Revised Report, Exhibit B, at 5.  The authors go on to specifically conclude, "Based on our assessment, we conclude that George & Co.'s use and co-presentation of 'LCR' and 'Left Center Right' in the marketplace

establishes a mental branding Association or connection between 'LCR' and 'Left Center Right' such that they are considered as distinct, interchangeable or 'one and the same' in consumers' minds (and retailers' minds) in identifying the source of the market offering." *Id.* Yet, in neither the original Report nor in the Revised Report do the authors provide what in their assessment causes them to reach that conclusion, particularly with respect to the assertion of what are considered in consumers' minds.

Hibbert and Swain are proffered to the Court not as individuals with firsthand knowledge concerning the underlying dispute, but rather as expert witnesses.  Thus, under Fed. R. Evid. 702, they can only testify:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

However, before an expert testifies before the fact finder, this Court must act as a "gatekeeper" to ensure that ". . . proffered testimony 'is not only relevant but reliable' and that it 'is sufficiently tied to the facts of the case that will aid the jury in resolving a factual dispute.' [Citation omitted]  The court need not admit an expert opinion that is connected to the underlying data 'only by the ipse dixit of the expert.'  [Citation omitted]  It may exclude such testimony if it determines 'that there is simply too great an analytical gap between the data and the opinion proffered.'  [Citation omitted]  We have observed, however, in the context of consumer confusion surveys that: 'as long as they are conducted according to accepted principles,' survey[s]... should ordinarily be found sufficiently reliable under *Daubert*.'"
*Lanphere Enterprises, Inc. v. Jiffy Lube International, Inc.*, 138 Fed. Appx. 20, 22, 2005 U.S.

App. LEXIS 10303, **3-4 (9th Cir. 2005) (*citing Daubert*, 509 U.S. at 589; other citations

omitted).  Though an unpublished opinion, *Lanphere* is particularly instructive.

   In that case, *Lanphere* presented two surveys, one conducted in June and one in

September.  The Ninth Circuit upheld the district court's exclusion of the June survey because ". .

. of the survey's failure to identify respondents who considered a Lanphere dealership to be their

dealership of choice for oil change services." *Id*. 138 Fed. Appx at 23, 2005 U.S. LEXIS 10303,

at **6.  In addition, the Ninth Circuit agreed with the district court's determination that ". . . the

report was inadmissible because there is too great an analytical gap between its conclusions and

the underlying data." *Id*. 138 Fed. Appx at 23, 2005 U.S. LEXIS 10303, at **7.  Similarly, the

court upheld the exclusion of the September survey, and the related report and testimony after an

examination of the specific questions asked and the responses received.  "In light of the

questionable connection between affirmative responses and Lanphere dealerships, the probative

value of these results is uncertain, at best." *Id*. 138 Fed. Appx at 24, 2005 U.S. LEXIS 10303, at

**8.

   In *Learning Networks, Inc. v. Discovery Communications, Inc*., 153 F. Supp. 785, 2001

U. S. Dist. LEXIS 18277, 57 F. R. Evid. Serv. (Callaghan) 739 (D. Md. 2001), the court

specifically discussed its gatekeeping role in the context of evaluating expert opinions based on

surveys in the context of a trademark infringement case.  In so doing, the court noted that even

before *Daubert*, it was ". . . necessary for a district court to pass upon the threshold question of

the validity of a survey before submitting the results to the jury for their consideration."  153 F.

Supp at 789.  The court noted, "Expert testimony concerning survey results may not be reliable if

the survey format does not accurately gauge consumer confusion between the marks at issue."

*Id.*, *citing Simon Property group, L.P. v. Mysimon, Inc.,* 104 F.Supp. 2d 1033, 1040 (S. D.  Ind. 2000).

In *Hodgon Powder Company, Inc. v. Alliant Techsystems, Inc.*, 2007 U.S. Dist. LEXIS 53209 (D. Kan. 2007), a case decided on July 20, 2007, the district court specifically addressed its gatekeeping function with respect to the admissibility of a survey relating to the issue of consumer confusion in a trademark dispute.  After noting that a survey must have been conducted according to generally accepted survey principles in order to be considered trustworthy, the Court examined the factors necessary to consider in determining the reliability and trustworthiness of a survey.  Those factors include: (1) whether the universe was properly chosen and defined; (2) whether the sample chosen was representative of that universe; (3) whether the questions asked of the interviewees were framed in a clear precise and nonleading manner; (4) whether the interview procedures were sound and followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) whether the data gathered was accurately reported; (6) whether the data was analyzed in accordance with accepted statistical principles; and (7) whether the objectivity of the entire process was assured.  *Id*. at 2.  In that case, the court excluded the survey and the resulting expert opinion because the survey was not conducted according to generally accepted survey principles, finding that the universe was underinclusive, the survey participants were not representative, the survey question was not clear precise, and the process was not objective.  *Id.* at 3.

In the case at bar, this Court cannot make the analysis required by *Daubert* and as set forth in *Hodgdon Powder Company* because none of the factors necessary for this Court to determine whether the Marketing Experts' findings concerning the impact of the relationship

between "LCR" and "Left Center Right" in the minds of consumers and retailers are reliable or trustworthy.  If the conclusion was the basis of interviews with retailers and consumers, then the authors were required to provide the information necessary to permit an analysis of the seven factor test set forth above.  If the conclusion was not based on a survey, then the authors were required to set forth sufficient information to satisfy the *Daubert* test: (1) whether the proffered technique can and has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential error rate; and (4) the general acceptance of the technique in the relevant community.  *HodgdonPowder Company* at 2.

**B.  The Marketing Experts' Opinion That There Is a "Significant Overlap in the Target Market and Marketing Mix Elements and Sub Elements Is so Vague and Undefined in the Report to Render That Opinion Inadmissible.**

Regarding the second conclusion that Hibbard and Swain used the "marketing mix" comparative analysis to conclude there is significant overlap with the parties' marketing, Hibbard and Swain allegedly examined the "4P's" of marketing – "product, pricing, place and promotion," but, in their original report gave no specifics as to the "sub-elements" of each of the "4P's" in relation to plaintiff or Imagination.  Exhibit A, Hibbard and Swain Report, at 6. Nowhere in the report did Hibbard and Swain identify specifically either plaintiff or defendants' distribution channels or markets, let alone acknowledge or address such issues as the fact that Imagination's distribution channels are primarily "big box" mass retail marketers, while plaintiff's primary distribution channels are primarily much smaller specialty toy and novelty stores.

Hibbard and Swain's original report hardly provides "a complete statement of all opinions to be expressed and the basis and reasons therefore," "the data or other information

considered by the witness in forming the opinions" or the "exhibits to be used as a summary of or support for the opinions" as required by Rule 26 (a)(2)(B).

The discovery requirement in Rule 26 (a)(2)(B) goes hand-in-hand with Fed. R. Evid. 702, allowing expert testimony only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. "While an expert need not consider *every* possible factor to render a 'reliable' opinion, the expert still must consider *enough* factors to make his or her opinion sufficiently reliable in the eyes of the court." *Microstrategy Inc. v. Business Objects, S.A.,* 429 F.3d 1344, 1355-1356 (Fed. Cir. 2005) (upholding trial court's decision to exclude expert report that failed to link a single loss to a specific misconduct and ignored significant factors that night have excluded the torts as the reason for the losses).[6]

The failure to link specific facts, for instance regarding Imagination and plaintiff's purported overlap in marketing to their generalized opinions, places the Court in the position that it cannot rule has to whether these experts considered the and appropriate information sufficient for it to make a "pre-admission determination (i.e. whether or not *enough* factors have been considered to make an expert report sufficiently reliable)." *Microstrategy*, 429 F.3d at 1355-1356. This Court "has the responsibility to exclude an expert opinion that overlooks factors that render the testimony unreliable and/or speculative." *Microstrategy*,  429 F.3d at 1355-1356.

---

[6]     As with the branding opinion, Hibbert and Swain's Revised Report (Exhibit B) added a new Appendix E, purporting to be a Comparison of the Marketing Mix.  While that grid comparison set forth a number of factors considered, it did not provide any guidance as to how certain conclusions were reached, how certain factors weighed, and how to determine if the opinion is trustworthy and reliable without providing the standards used in reaching the opinion.  See pages 8-9, *ante*.  Thus, even if the Court were to consider the Revised Report, it still fails to meet the requirements of Rule 26(a)(2)(B).

A Rule 26 (a)(2)(B) report is supposed to be a "detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefore" in order to avoid substance of expert testimony that "was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of a witness."  Fed. R. Civ. P. 26 (Advisory Committee's note to 1993 amendments).  The amendments to Rule 26 (a)(2)(B) are meant to avoid exactly what plaintiff's counsel's offers as the "solution" to the deficient report – to have Imagination depose the experts to obtain more information on the experts' basis, conclusions and terms.  *See* Exhibit C, Letter dated August 21, 2007, at 4; *see also Sharpe v. United States*, 230 F.R.D. 452, 459 (E.D. Va. 2005) (citing *Saldado v. Gen. Motors Corp.*, 150 F.3d 735, 742, n. 6 (7th Cir. 1998), for proposition that "an expert report must be detailed and complete so that 'opposing counsel is not forced to depose an expert in order to avoid ambush at trial and sufficiently complete so as to shorten or decrease the need for expert depositions and conserve resources'").  Imagination suffers considerable prejudice by not having the basis and reasons for Hibbard and Swain's opinions and the data and other information considered in forming the opinions, particularly when Imagination had only until August 31, 2007 to identify its own experts to rebut Hibbard and Swain.

The failure to provide the information required by Rule 26 at the time specified in the Scheduling Order is significant.  Under the scheduling order, defendants' expert designations are due on August 31, 2007, barely two weeks after plaintiff's expert designations were due.  Defendants received the Revised Report on August 23, 2007, eight days after the designations were due and only eight days before defendants' counter-designations are due.  It is significant that Rule 26(e)(1) requires a party to supplement its experts' reports and deposition testimony

when the party learns of new information.  In this instance the Revised Report contains

information new to the defendants but not new to plaintiff.  Rather it simply incorporates some

of the information required to have been in the original report and which was in the authors'

possession at the time the original report was drafted.  Thus, without having received leave to

extend the time for filing properly responsive expert designations, the Court should not consider

the Revised Report a cure for plaintiff's initial failure.  However, since the Revised Report is still

deficient, it too should be barred.  "Because this court affirms the district court's exclusion of the

initial report due to its flawed methodology, this court affirms the district court's exclusion of the

supplemental revised report as well.  This court need not address whether the supplemental

revised report were timely filed."  *Microstrategy*, 429 F.2d at 1356.

Counsel's suggestion that the deficiencies in their Marketing Experts' reports could be

cured by providing that information during the experts' depositions (Exhibit C at 4-5) is

insufficient.  First, defendants should not be forced to use the deposition of the experts to

discover the fundamental underpinnings of that which the expert considered and how that

consideration supports his report.  Rather, the deposition should be used to prod and test the

expert after having full knowledge of his opinions, the basis therefore and the matters he

considered in reaching it.  Second, the ability to prod and test is significantly compromised if

those matters are still not disclosed and, therefore, cannot be considered in the preparation for the

deposition.  Third, by requiring defendants to draw this information out of the experts during

depositions plaintiff, in effect, attempts to shift the economic burden of production of this

information to the defendants.  As reflected in Appendix A to the Revised Report, Professors

Hibbard and Swain are to be paid $325 per hour, each, for review, research, analysis and report

writing.  However, they apparently are charging $450 per hour each for deposition or trial

testimony.  To require defendants to pay $450 per hour to either or both of the authors in order to elicit information specified by Rule 26, and which was required to be produced on August 15, would defeat the purpose of the Rule as well as the Scheduling Order.

### C.  The Marketing Experts' Opinion Merely Consists of Commonly Expressed Principles.

Even if the contents of Hibbard and Swain's report were sufficient to satisfy Rule 26 (a)(2)(B), Hibbard and Swain's opinions amount to inadmissible legal conclusions and mere commonly expressed principles.  Although an expert's testimony is "not objectionable because it embraces an ultimate issue to be decided by the trier of fact," such testimony must nonetheless be "otherwise admissible."  Fed. R. Evid. 704 (a).  Despite the fact that Rule 704 (a) abolishes the "ultimate issue" rule, it "'does not lower the bas so as to admit all opinions.'  As a condition to admissibility under Rule 704 (a), testimony on ultimate issues must be otherwise admissible under the Rules of Evidence."  *United States v. Barile*, 286 F.3d 749, 759 (4th Cir. 2002) (citation omitted).  "Expert testimony on an ultimate issue is therefore excludable under *Rule 702* if it does not aid the jury."  *Barile*, 286 F.3d at 760.

Hibbard and Swain's report and testimony will not aid the jury due to their inadmissible legal conclusions.  For example, they assert that plaintiff's "LCR" mark and purported "Left Center Right" mark are likely to be perceived as distinct and interchangeable brand names, and that the marketing of Imagination's dice game and plaintiff's dice game significantly overlap.  "[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."  *McIver*, 470 F.3d at 562.  The Fourth Circuit has stated that the

> best way to determine whether opinion testimony contains legal conclusions, 'is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.'  To

> determine when a question posed to an expert witness calls for an improper legal
> conclusion, the district court should consider first whether the question tracks the
> language of the legal principle at issue or of the applicable statute, and second,
> whether any terms employed have specialized legal meaning.

*Barile*, 286 F.3d at 760 (citations omitted).  Hibbard and Swain's testimony does not aim to solicit information, but rather provides mere legal conclusions that "would supply the jury with no information other than the expert's view of how its verdict should read."  *Barile*, 286 F.3d at 760.

Hibbard and Swain's testimony likewise will not aid the jury because, "when stripped of its technical gloss," it does "no more than state the obvious."  *Persinger v. Norfolk & Western Railway Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990) (expert's testimony regarding a formula "based on several basic variables including the distance of the lift, and the distance from the body at which the weight was held" inadmissible as a typical juror knows it is more difficult to lift objects from a seated position).  For example, regarding Hibbard and Swain's first conclusion about purported interchangeable brand names, the report states:  "Dice games are games that use or incorporate die as their central (versus secondary) component, usually as a random device.  Dice games would be considered a product category within the larger market of games."  Exhibit A, Hibbard and Swain Report, p. 1.  As a second example, regarding Hibbard and Swain's conclusion about purported marketing overlap, the report lists what it calls the "4P's" – product, price, place and promotion.  Exhibit A, Hibbard and Swain Report, p. 5-6.  Such basis principles present a situation analogous to the formula in *Persinger* "representing a 'commonly expressed' principle."  *Persinger*, 920 F.2d at 1188.  Because the evidence would be within the common

knowledge of jurors, it is of no assistance and thus inadmissible under FRE 702.[7]  *See Persinger*, 920 F.2d at 1188; *see also Scott*, 789 F.2d at 1055.

**CONCLUSION**

WHEREFORE, Defendants Imagination Entertainment Limited, Imagination Holdings Pty Ltd. and Imagination DVD, Inc. request that this Court exclude the report and bar the testimony of plaintiff's experts pursuant to Rule 37 (c)(1) and as inadmissible legal conclusions and commonly expressed principles, and award Defendants Imagination Entertainment Limited, Imagination Holdings Pty Ltd. and Imagination DVD, Inc. their costs, attorneys' fees, and other expenses.

                                        Respectfully submitted,

                                        /s/ William F. Krebs
                                        William F. Krebs, Esquire
                                        Virginia Bar No. 17347
                                        James R. Schroll, Esquire
                                        Virginia Bar No.19646
                                        Christopher A. Glaser, Esquire
                                        Virginia Bar No. 43491
                                        Attorney for Defendants Imagination
                                        Entertainment Ltd., and Imagination
                                        Holdings Pty Ltd.
                                        BEAN, KINNEY & KORMAN, P.C.
                                        2300 Wilson Blvd., Seventh Floor
                                        Arlington, VA 22201
                                        Phone:   703-525-4000
                                        Fax:      703-525-2207

---

[7]   This is not to say the defendants concede that the opinion reached by Hibbard and Swain is correct or obvious, but only that the factors considered are within the common knowledge of the jury.  The plaintiff can try to establish those factual matters contained in Hibbard and Swain grid, and let the jury determine whether, under those principles, there is a market overlap and how significant it may be.

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st Day of August, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will then send a notification of such filing to the following:

Monica Riva Talley, Esquire
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Ave, N.W.
Washington, DC 20001-4413
Counsel for Plaintiff

And I certify that I mailed the foregoing by US mail to the following non–filing users:

Douglas A. Rettew, Esquire
Mark Sommers, Esquire
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Ave, N.W.
Washington, DC 20001-4413
Co-Counsel for Plaintiff

And

Jennifer L Whitelaw, Esquire
WHITELAW LEGAL GROUP
3838  Tamiami Trial North, Third Floor
Naples, FL 34103
Co-Counsel for Plaintiff

/s/ William F. Krebs
William F. Krebs, Esq
Virginia Bar No. 17347
Attorney for Defendants Imagination
Entertainment Ltd., and Imagination
Holdings Pty Ltd.
BEAN, KINNEY & KORMAN, P.C.
2300 Wilson Blvd., Seventh Floor
Arlington, VA 22201
Phone:  703-525-4000
Fax:      703-525-2207
wkrebs@beankinney.com