

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

GEORGE & COMPANY, LLC

     Plaintiff

v.

IMAGINATION ENTERTAINMENT
LIMITED, et al.,

     Defendants.

Civil No. 1:07 cv 498 (LMB/TRJ)

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THIER MOTION IN LIMINE TO EXCLUDE REPORT AND TESTIMONY OF PLAINTIFF'S EXPERTS

BEAN, KINNEY & KORMAN, P.C.

William F. Krebs, Esquire
Virginia Bar No. 17347
James R. Schroll, Esquire
Virginia Bar No. 19646
Christopher A. Glaser, Esquire
Virginia Bar No. 43491
Attorney for Defendants Imagination
Entertainment Ltd., Imagination Holdings
   Pty Ltd. and Imagination DVD, Inc.
BEAN, KINNEY & KORMAN, P.C.
2300 Wilson Blvd., Seventh Floor
Arlington, VA 22201
Phone:  703-525-4000
Fax:    703-525-2207
wkrebs@beankinney.com

## TABLE OF CONTENTS

Table of Authorities                                                                                          iii

Introduction                                                                                                  1

Statement of Facts                                                                                            3

   I.    Background                                                                                  3

   II.   Plaintiff's Marketing Experts' Reports and Expected Testimony                              4

       A.   The Marketing Experts' Conclusions and Basic Methodology                           4

       B.   Dr. Swain's Testimony that the Names "LCR" and "Left Center Right" Allegedly are Likely to be Perceived as Distinct Interchangeable Brand Names and Identifiers Associated with Plaintiff's LCR Dice Game      8

       C.   Dr. Hibbard's Testimony that the "Marketing Mix" Comparative Analysis Purportedly Leads to the Conclusion that the Marketing of Plaintiff's and Defendants' Dice Game Significantly Overlap      10

Argument                                                                                                      14

   I.    Hibbard and Swain's Report and Testimony Should be Excluded Because the Report and Testimony Will Not Aid the Jury, as They Are Irrelevant and Amount to Mere Legal Conclusions and Commonly Expressed Principles      15

   II.   Hibbard and Swain's Report and Testimony Should be Excluded as Insufficient Under *Daubert* and Speculative      18

   III.  Hibbard and Swain's Report and Testimony Should be Excluded as Prejudicial      21

Conclusion                                                                                                    21

Certificate of Service                                                                                        23

## TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*                15, 18-20, 21
   509 U.S. 579, 113 S.Ct. 2786 (1993)

*United States v. McIver*                                     16
   470 F.3d 550 (4th Cir. 2006)

*Microstrategy Inc. v. Business Objects, S.A.*               14
   429 F.3d 1344 (Fed. Cir. 2005)

*O'Neill v. Windshire-Copeland Associates, L.P.*             20
   372 F.3d 281 (4th Cir. 2004)

*United States v. Barile*                                    16, 17
   286 F.3d 749 (4th Cir. 2002)

*Persinger v. Norfolk & Western Railway Company*             14, 17, 18
   920 F.2d 1185 (4th Cir. 1990)

*Scott v. Sears, Roebuck & Co.*                              17, 18
   789 F.2d 1052 (4th Cir. 1986)

**Statutes and Rules**

Fed. R. Evid. 403                                            21

Fed. R. Evid. 702                                            17, 18-20

Fed. R. Evid. 703                                            19

Fed. R. Evid. 704                                            16, 18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| GEORGE & COMPANY, LLC | |
| Plaintiff | |
| v. | Civil No. 1:07 cv 498 (LMB/TRJ) |
| IMAGINATION ENTERTAINMENT LIMITED, et al., | |
| Defendants. | |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THIER MOTION IN LIMINE TO EXCLUDE REPORT AND TESTIMONY OF PLAINTIFF'S EXPERTS

COME NOW Defendants Imagination Entertainment Limited, Imagination Holdings Pty Ltd. and Imagination DVD, Inc. (collectively, "Imagination") and present this Memorandum in Support of Defendants' Motion in Limine to Exclude Reports and Testimony of Plaintiff's Experts. In support of their motion, Imagination states the following:

### INTRODUCTION

The crucial issue in this case is whether plaintiff uses and can assert rights to Imagination's mark "Left Center Right." Plaintiff owns the mark "LCR" but has never used or sought to trademark "Left Center Right." In fact, plaintiffs' experts concede that the only two ways plaintiff uses the words "left," "center" and "right" are, as shown in the depiction on the top of the next page: 1) in a tag line LEFT, CENTER OR RIGHT – DON'T LOSE YOUR CHIPS! and (2) in an illustrative design with arrows, chips and dice ("Illustrative Design of Game Play").

1



    In an effort to divert the jury from the fact that plaintiff does even not use the mark "Left

Center Right," plaintiff seeks to introduce expert testimony on wholly irrelevant issues of branding,

anacronyms and initialism, and alleged market overlap between the parties' dice games.

    Plaintiff has designated two marketing experts to testify at trial in this case, Dr. Jonathan D.

Hibbard ("Hibbard") and Dr. Scott D. Swain ("Swain") (collectively "Marketing Experts"). Plaintiff

intends to have Swain opine that the names "LCR" and "Left Center Right" as used by plaintiff and

in the marketplace are likely to be perceived as distinct and interchangeable brand names associated

with plaintiff's LCR dice game. Plaintiff intends to have Hibbard testify that the marketing of

plaintiff's LCR dice game and of defendants' Left Center Right dice game significantly overlap.

However, none of these opinions address the main issue at hand – whether plaintiff even uses and

can assert rights to the mark "Left Center Right." As irrelevant, the opinions do nothing to aid the

jury. Rather, the opinions are mere legal conclusions and commonly expressed principles proffered

in an effort to supplant the role of the jury rather than aid the jury. In addition, Swain and Hibbard's

2

opinions are also speculative, insufficient to meet the requirements of *Daubert*, and more prejudicial than probative.

## STATEMENT OF FACTS

### I.  BACKGROUND

Imagination is a worldwide toy distributor based in Australia.[1]  Much of Imagination's business consists of repackaging generic games whose rights lie within the public domain and selling them as conventional dice or board games, or as interactive DVDs.  Unlike plaintiff, whose primary distribution chain consists of smaller specialty toy and novelty stores, Imagination's distribution channels in the United States consist primarily of mass retail marketers.

At issue in this case is the name of Imagination's most recent dice game, "Left Center Right."  The game itself is extremely simple, based upon the principle of passing gaming chips to the player on the thrower's left or right, or paying to a center pot, depending upon the throw of the dice.[2]

Plaintiff George & Co., LLC ("George" or "plaintiff") manufactures and distributes a virtually identical game which it calls "LCR."  However, upon learning of defendants' game, it now asserts it owns four trademarks associated with this game: (1) LEFT CENTER RIGHT; (2)

---

[1]  Defendant Imagination DVD, Inc. is a California corporation and a wholly owned subsidiary of defendant Imagination Entertainment Limited.

[2]  Each player begins the game with an equal number of chips.  The players take turns throwing three dice.  Each six sided die as a face with an "L," "R," and "C;" the remaining three faces all have a dot.  The thrower is required to pass to the player to his left the number of chips equal to the number of die that come up "L," and to the player on his right on the number of chips equal to the number of die to come up "R."  If any the dice comes up "C," the thrower must pay up to a center pot the number of chips equal to the number of dice that show C.  Any die which come up with the dot is neutral and no chips are passed respect to those dice.  The game continues until only one player is left with chips.

3

LEFT, CENTER OR RIGHT – DON'T LOSE YOUR CHIPS!; (3) LCR; and (4) the letters

"LCR" combined with a "rolling-dice design." Complaint ¶ 12. Of those four marks, plaintiff

recently applied for and received federal copyright registrations for the two marks that involve

LCR (numbers 3 and 4 above).[3] Complaint ¶ 17. In contrast, purported marks (1) and (2) were

not registered and plaintiff relies on them solely as common-law trademarks.

While defendants acknowledge plaintiff's registered marks of LCR and LCR combined

with the rolling dice design, defendants dispute that plaintiff owns or uses LEFT CENTER

RIGHT as a trademark and further assert that defendants' use of LEFT CENTER RIGHT does

not infringe on any trademark owned or used by George with respect to the game. Since George

does not claim in this case that defendants' sale of the game, standing alone, is wrongful or

infringes on any intellectual property rights owned by George, the primary issue presented in this

case is whether George possesses a protectable intellectual property rights in the term LEFT

CENTER RIGHT.

## II.   PLAINTIFF'S MARKETING EXPERTS' REPORTS AND EXPECTED TESTIMONY

### A.   *THE MARKETING EXPERTS' CONCLUSIONS AND BASIC METHODOLOGY*

Professors Hibbard and Swain, as "experts and scholars in marketing," submitted a report

making two general conclusions. Exhibit A, Hibbard-Swain September 14, 2007 Report

("Hibbard-Swain Report"), p. 1. As disclosed in that report, plaintiff expects Dr. Swain will

testify that "the names 'LCR' and 'Left Center Right,' as they are used by George & Co and

---

[3]   Since learning of Imagination's intent to introduce its game under the name Left Center Right,
plaintiff filed for trademark registration of the purported mark number two, above, "LEFT,
CENTER OR RIGHT – DON'T LOSE YOUR CHIPS!" and the Illustrative Design of Game
Play.

appear in the marketplace are likely to be perceived by consumers/trade partners and potential consumers/ trade partners as distinct, interchangeable brand names/identifiers of source and associated with the George & Co dice game." *Id.* at 1.   Plaintiff anticipates Dr. Hibbard will testify that the "marketing mix" comparative analysis of "product, price, place, promotion" leads to the conclusion that the "marketing of the Imagination Holding's dice game significantly overlaps with the marketing of George & Co's dice game." *Id.* at 1.   Although the report is identified as being co-authored, Dr. Swain was the primary author and expert as to the brand-name perception issue and Dr. Hibbard was the primary author an expert as to the marketing mix issue.  Exhibit B, Swain Transcript, p. 9, lines 13-18.

Hibbard and Swain purchased three of plaintiff's dice games from three specialty stores – Boing, Compleat Strategist and Learning Express – for $6.00 to $7.99 a piece.  Exhibit C, Hibbard Transcript, p. 15, line 9 to p. 16, line 12.  All three of plaintiff's dice games that the experts purchased came in tubes, not in a "blister pack" with a backboard such as the one on the blister pack depicted on page 2.  Exhibit C, Hibbard Transcript, p. 16, line 16 to p. 17 line 22.

As to plaintiff's game described in the Marketing Experts' Report, Hibbard admits he was describing only plaintiff's new blue packaging, and could not recall if the Report discussed plaintiff's previous white packaging.  Exhibit C, Hibbard Transcript, p. 43-44.  Hibbard concedes that he would not know what packaging designs of plaintiff's games were actually marketed.[4] Exhibit C, Hibbard Transcript, p. 52, lines 8-13, p. 56, lines 4-9.  A comparison of plaintiff's white blister pack and plaintiff's new blue design can be found on the next page.

---

[4]   Up until the filing of this lawsuit, plaintiff's blister pack and store rack displays utilized the white background design.  After this lawsuit was filed and after plaintiff was aware of Imagination's proposed predominantly blue design as reflected in its catalog, plaintiff redesigned its packaging and its display rack to blue design referenced by Hibbard.  *See* Exhibit D, April 3, 2007 email from P. Smilanich to M. Anderson; P. Smilanich Deposition Transcript, pp. 127-129.

 

Hibbard and Swain also purchased defendant's dice game, packaged in a tin, from Amazon.com for $19.99 plus shipping, and from Toys R Us for $16.99.  Exhibit C, Hibbard Transcript, p. 28, lines 16-20; p. 57, lines 18-23.  A depiction of defendant's dice game in a tin is shown below.



In preparing their Report, Hibbard and Swain only spoke with retailers and did not speak to or interview any consumers.  Exhibit B, Swain Transcript, p. 56, lines 4-14; Exhibit C, Hibbard Transcript, p. 48, lines 9-14.  Instead, Hibbard and Swain performed internet searches,

visited some stores, and made phone calls to other stores. Exhibit C, Hibbard Transcript, p. 80, line 17 to p. 81 line 12. This contact was done solely to gather information, to help "make an assessment as to whether or not there was an association between Left Center Right and LCR in consumer's minds." Exhibit B, Swain Transcript, p. 49, lines 5-9. The Marketing Experts conceded they did not conduct a survey or a scientific statistical sampling. Exhibit B, Swain Transcript, p. 48 line 23 to p. 49 line 2.

Based on indications in the pleadings, Hibbard and Swain identified retailers who were likely to carry plaintiff's game and those likely to carry defendants' game. Exhibit B, Swain Transcript, p. 49, lines 13-17. Swain and Hibbard used a script of questions. Exhibit A, Hibbard-Swain Report, Appendix F. For plaintiff's game, the Marketing Experts contacted small toy and hobby stores, and asked those stores if they carried "LCR." Exhibit B, Swain Transcript, p. 50, lines 18-21. They did not ask these stores whether they carried "Left Center Right." Exhibit B, Swain Transcript, p. 50, line 22 to p. 51, line 2. If the store indicated that it carried "LCR," Swain and Hibbard then asked if they knew what "LCR" stood for. Exhibit B, Swain Transcript, p. 52, lines 12-16. If the store said no, the experts would suggest that it is sometimes called "Left Center Right." Exhibit B, Swain Transcript, p. 52, line 24 to p. 53 line 2. Five stores indicated that they carried the game. Exhibit B, Swain Transcript, p. 58, line 20 to p. 59, line 2. From the pricing information, it appeared that those stores were referring to plaintiff's dice game. Exhibit B, Swain Transcript, p. 55, line 24 to p. 56, line 3.

The experts similarly contacted stores that they thought were likely to carry defendants' dice game; of those stores, one chain, Toys R Us, carried Left Center Right in all five outlets they contacted and the price of the game in each of the five stores was consistent with

7

defendant's game.  Exhibit A, Hibbard-Swain Report, Appendix F; Exhibit C, Hibbard

Transcript, p. 83, lines 1-9.

Of the stores visited or called, not one store misidentified plaintiff's game as defendants'

game, or defendants' game as plaintiff's game.  Exhibit B, Swain Transcript, p. 63, lines 18-22.

**B.    *DR. SWAIN'S TESTIMONY THAT THE NAMES "LCR" AND "LEFT CENTER RIGHT" ALLEGEDLY ARE LIKELY TO BE PERCEIVED AS DISTINCT, INTERCHANGEABLE BRAND NAMES AND IDENTIFIERS ASSOCIATED WITH PLAINTIFF'S LCR DICE GAME***

Swain is an Assistant Professor at Boston University and prior to this case has never been

engaged as an expert.  Exhibit B, Swain Transcript, p. 4, lines10-16; p. 8, lines 13-14.  Swain's

report analyzes the facts of this case in the context of brand names, but not trademark law.

Exhibit B, Swain Transcript, p. 26, line 22 to p. 28, line 24.  In fact, Swain is unfamiliar with

trademarks and trademark law.  Exhibit B, Swain Transcript, p. 26, line 22 to p. 28, line 24.  In

particular, Swain is unfamiliar with the distinctions between generic, descriptive and suggestive

marks.  Exhibit B, Swain Transcript, p. 63, line 23 to p. 70, line 24.

Although Swain opines on the extent to which plaintiff purportedly uses the marks LCR

and Left Center Right, Swain and Hibbard acknowledge that the only place where plaintiff uses

the words left, center and right are (1) in the tag line LEFT, CENTER OR RIGHT – DON'T

LOSE YOUR CHIPS! and (2) in the Illustrative Design of Game Play with arrows, chips and

dice.  Exhibit B, Swain Transcript, p. 15, lines 9-14; p. 25, line 2 to p. 26, line 12; Exhibit C,

Hibbard Transcript, p. 47, lines 2-9.  Swain concedes that Plaintiff's website contains consumer

endorsements of the game, and those consumer comments refer to plaintiff's game as "LCR," not

"Left, Center, Right."  Exhibit B, Swain Deposition, p. 19, line 7 to p. 21. line 1.  The rules on

the website contain "LCR" and not "Left, Center, Right."  Exhibit B, Swain Transcript, p. 21,

lines 12-20. Plaintiff's website also targets store owners and potential distributors, referring to its dice game, "LCR." Exhibit B, Swain Transcript, p. 21, line 21 to p. 22 line 20.

Nonetheless, Swain would testify that the names "'LCR' and 'Left Center Right,' as they are used by George & Co and appear in the marketplace, are likely to be perceived by consumers/trade partners and potential consumers/trade partners as distinct, interchangeable brand names/identifiers of source and associated with the George & Co dice game." Exhibit A, Hibbard-Swain Report, p. 1. One of the inputs for this conclusion is Swain's analysis of generally how abbreviations are associated in the minds of consumers. Exhibit B, Swain Transcript, p. 60 line 24 to p. 61, line 5. The second input is "consumer-generated content" found in Appendix C of the Hibbard-Swain Report. Exhibit B, Swain Transcript, p. 61, lines 5-12. This "consumer-generated content" was based on visiting websites, reviewing undisclosed[5] materials and pleadings provided by plaintiff's counsel, and contacting stores in person and by phone. Exhibit B, Swain Transcript, p. 62, lines 2-12.

Regarding Swain's opinion as to the use of acronyms or initialism, Swain concedes that he does not know which name came first in the market place, "LCR" or "Left Center Right." Exhibit B, Swain Transcript, p. 30 lines 14-17. Swain is unaware of any acronyms developed prior to the development of the underlying name. Exhibit B, Swain Transcript, p. 32, lines 12-16. When asked if the term "Left Center Right" came from an association with the dice game

---

[5] On September 7, 2007, the Court found that plaintiff's Marketing Experts had failed to meet the requirements for an expert witness report as set forth in FRCP 26(a)(2)(B). The Court, treating the Defendants' earlier motion to exclude these experts as a motion to compel, ruled that the Report failed to provide the data and other information considered by the Marketing Experts in preparing the report, as required by FRCP 26(a)(2)(B). Plaintiff since provided additional information and data pursuant to the Court's ruling. However, counsel notes that the Marketing Experts testified during their depositions that they received a number of documents and things from plaintiff's counsel upon which they relied in forming their opinions. *See* Exhibit B, Transcript of Deposition of Scott D. Swain, p. 33; *see also* Exhibit C, Transcript of Deposition of Jonathan D. Hibbard, p. 12. Plaintiff to date still has not fully identified or produced to counsel the information plaintiff provided to the Marketing Experts.

9

and how it is played, Swain stated that he did not believe "it has anything to do with how the game is played" and that it is "due to the information that is in the marketplace." Exhibit B, Swain Transcript, p. 30, lines 1-13. Nonetheless, Swain believes that "LCR" is an abbreviation for "Left Center Right." Exhibit B, Swain Transcript, p. 33, lines 3-5.

### C.   DR. HIBBARD'S TESTIMONY THAT THE "MARKETING MIX" COMPARATIVE ANALYSIS PURPORTEDLY LEADS TO THE CONCLUSION THAT THE MARKETING OF PLAINTIFF'S AND DEFENDANTS' DICE GAMES SIGNIFICANTLY OVERLAP

As noted by the Court in its ruling on the plaintiff's Motion for Preliminary Injunction, plaintiff operates primarily in specialty stores, while defendants operate primarily in the mass market retail stores. Nevertheless, in an attempt to argue that the marketing of plaintiff's and defendants' dice game "significantly overlap," Plaintiff expects Hibbard to testify to the "fundamental framework" in marketing called the "marketing mix" or the "4P's." Exhibit A, Hibbard-Swain Report, p. 6 and Appendix E. However, Hibbard's opinion amounts to nothing more than a subjective "analysis" of factors wholly within the common knowledge of the jury. Hibbard subjective approach allows him to emphasize certain irrelevant factors (such as the fact that the parties have the same or similar dice games) and ignore or minimize the relevant factors (such as the difference in places of distribution or price) to reach the conclusion that because the parties market similar products to people of all ages, the marketing of parties' dice games must "significantly" overlap. However, this would be the case for any dice game, no matter the game – or, as relevant to this case, the name.

According to Hibbard, sellers of goods and services must first concentrate their resources on a target market, then look to satisfy the target market's needs by analyzing the 4P's, which are product, price, place and promotion. Exhibit A, Hibbard-Swain Report, p. 6. As to "product," Hibbard states that a product has characteristics, such as appearance, functionality, packaging,

brand name, service and support and warranty.  Exhibit A, Hibbard-Swain Report, p. 6.  As to

"price," Hibbard states that price includes what the product costs to buy, lease or rent, and what

the terms of payment are, including discounts, financing and leasing.  Exhibit A, Hibbard-Swain

Report, p. 6.  As to "place," Hibbard states this includes the location or place of sale of the

product, the distribution channel members and target market coverage.  Exhibit A, Hibbard-

Swain Report, p. 6.  As to "promotion," Hibbard states that this includes advertising, selling,

promotions, direct marketing and public relations.  Exhibit A, Hibbard-Swain Report, p. 6.

Analyzing "product," Hibbard understandably places plaintiff's and defendants' dice

games in the same product categories, with similar or the same components of dice and chips and

similar or the same functionality.  Exhibit C, Hibbard Transcript, p. 48, line 22 to p. 49, line 12.

As to price, Hibbard concedes, consistent with the prices when he and Swain purchased

the parties' games, that the price of plaintiff's game was a maximum of $7.99, and that the price

of defendants' game was consistently higher.  Exhibit C, Hibbard Transcript, p. 58, lines 15-19.

However, Hibbard minimizes this significant difference in price by stating that prices such as

"$7.99 versus $12.99 versus $16.99 or $19.99 for purchasing of a game *may not be* a significant

difference to consumers."  Exhibit C, Hibbard Transcript, p. 67, lines 9-14 (emphasis added).

However, he neither opines in his report that the price differential (with the lowest price of

Imagination's game more than double the highest price of George's game, Exhibit A, Hibbard

and Swain Report, Appendix E at 5) is not a significant difference nor any basis from which the

jury could determine from this report that it is not a significant differential.

As to place, Hibbard refers to five different distribution channels used by plaintiff: (1) the

internet; (2) small toy and hobby retailers; (3) retail chains, e.g., Spencer's; (4) catalogs, mail

order and telephone orders; and (5) trade shows, while Imagination's distribution channels appear

11

to be: (1) the Internet; (2) Toys "R" Us (and other mass retailers); (3) specialty store retailers; and (4) trade shows. Exhibit A, Hibbard-Swain Report, Appendix E, p. 5. Hibbard concedes that he was given no information on, and therefore can not state an opinion about, the percentage of sales for plaintiff and defendant in each channel. Exhibit C, Hibbard Transcript, p. 61, line 2 to p. 62, line 15. However, Hibbard attempts to minimize the importance of this point by claiming this is "one data point in a collision of data points across the entire analysis." Exhibit C, Hibbard Transcript, p. 63, lines 16-17.

Regarding the packaging of the parties' dice games, Hibbard believes there is "commonality" between the parties packaging. However, Hibbard's opinion in the Report is confined to plaintiff's new blue packaging and defendant's blue mockup packaging that was never actually sold. Exhibit C, Hibbard Transcript, p. 55, lines 6-9, p. 88, lines 14-16; Exhibit A, Hibbard-Swain Report, Appendix E at 3 ("With respect to colors, the George & Co. packaging in the blister pack and the colored box with tube pack and the Imagination Holdings predominantly blue colored box appear to use common color palettes."). In his report, Hibbard did not state an opinion regarding plaintiff's former white packaging or defendants' actual red packaging. Exhibit C, Hibbard Transcript, p. 89, lines 7-16.

In an effort to claim that there was any similarity between plaintiff's new packaging and defendant's current red packaging, Hibbard stated that there was the "same set of color pallets" based on plaintiff's occasional use of yellow or red chips visible through the clear plastic tube. Exhibit C, Hibbard Transcript, p. 89, lines 11-16. Examples of plaintiff's prior white packaging and new blue packaging, and Imagination's prior blue packaging mockup (that was never sold in the market) and current red packaging are on the following page:




Plaintiff's previous white packaging      Plaintiff's current blue packaging





Defendants' previous          Defendants' current red packaging
blue mockup

Hibbard ultimately concludes that there is significant overlap in the target market and

marketing mix elements and sub-elements between the parties' games.  Exhibit A, Hibbard-

Swain Report, p. 8.  When pressed on how Hibbard reaches that conclusion, Hibbard merely

states that this conclusion of "significant overlap" is based on looking at areas in his 4P's table where there appears to be commonality. Exhibit C, Hibbard Transcript, p. 75, line 17 to p. 76, line 18. Hibbard did not use a point system, formula, or other method to weigh these elements and sub-elements. Exhibit C, Hibbard Transcript, p. 85, line 19 to p. 86, line 9. In fact, Hibbard can articulate no methodology to determine what is "significant" versus "insignificant" overlap. Exhibit C, Hibbard Transcript, p. 75, line 22 to p. 76, line 18. Nor can Hubbard refute the fact that virtually any two dice games will have what he deems to be "significant overlap." Exhibit C, Hibbard Transcript, p. 79, line 23 to p. 80, line 13. Moreover, Hibbard provides no indication of what, if any, weight should be attributed to the disparity in price, color, display size, or primary distribution channels. Exhibit C, Hibbard Transcript, p. 84, line 21 through p. 85, line 10. In fact, the large that it appears that Hibbard's opinion is significant overlap results primarily from the fact that both games target the same consumers, that is: consumers of "most all ages," "kids," "adults," "families," and "number of players" (three or more). Exhibit C., Hibbard Transcript, p. 78, line 3 to p. 80, line 14; Exhibit A, Hibbard-Swain Report, Appendix E at 1.

**ARGUMENT**

Although Hibbard and Swain may be qualified to testify as experts in the field of marketing, that "does not mean that [their] testimony is admissible so long as [they are] qualified.... To the contrary, the district court has an obligation to weigh the admissibility of expert evidence under the Federal Rules." *Microstrategy, Inc. v. Business Objects, S.A., et al.*, 429 F.3d 1344, 1355 (4th Cir. 2005). The question of whether expert evidence is admissible lies within the sound discretion of the trial court and must be upheld absent an abuse of discretion. *See e.g. Persinger v. Norfok & Western Railway Co.*, 920 F.2d 1185 (4th Cir. 1990).

14

Hibbard and Swain's report and testimony should be excluded as unable to help the jury because the report and testimony are irrelevant and based on mere legal conclusions and commonly expressed principles. Additionally, the opinions are speculative and insufficient under *Daubert*, and are more prejudicial than probative.

I. **HIBBARD AND SWAIN'S REPORT AND TESTIMONY SHOULD BE EXCLUDED BECAUSE THE REPORT AND TESTIMONY WILL NOT AID THE JURY, AS THEY ARE IRRELEVANT AND AMOUNT TO MERE LEGAL CONCLUSIONS AND COMMONLY EXPRESSED PRINCIPLES**

Hibbard and Swain's report makes two broad conclusions that the marks "LCR" and "Left Center Right" are likely to be perceived as distinct and interchangeable brand names, and that the marketing of Imagination's dice game and plaintiff's dice game significantly overlap. Exhibit A, Hibbard and Swain Report, p. 1. These sweeping conclusions are back door attempts to allow Hibbard and Swain to divert the jury from the fact that plaintiff does not use the mark "Left Center Right." Additionally, plaintiff attempts to have the experts place their spin on commonly expressed principles in an attempt to proffer legal conclusions that consumer confusion allegedly exists between the parties' products. Allowing such testimony will not aid the jury, but rather supplant the jury's fact-finding role.

First, Swain and Hibbard's testimony is irrelevant because it does nothing to address the issue at hand – whether plaintiff uses and can assert rights in the trademark "Left Center Right." "Expert testimony which does not relate to any issue in the case is not relevant, and, ergo, non-helpful." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 591, 113 S. Ct. 2786, 2795 (1993). Swain's opinion discusses branding, and not trademark issues. When deposed about topics potentially relevant to the trademark issues in this case, such as whether the name "International Business Machines" is descriptive even if "IBM" is suggestive, Swain chose to minimize those issues and not tie them in to his opinion.

15

Hibbard's opinion discusses a framework of overall marketing concepts to emphasize that two dice games have "substantial overlap" in the market. However, everything within that framework is within common knowledge of the jury, and focused on the "game," not the "name." For instance, that plaintiff's marketing materials show yellow chips and defendant's packaging has yellow has nothing to do with the name of the games and alleged trademark infringement.

Second, Hibbard and Swain cannot testify, as plaintiff would wish, that there is consumer confusion in the marketplace between plaintiff's LCR mark and defendant's Left Center Right Mark. "[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). The Fourth Circuit has stated that the

> best way to determine whether opinion testimony contains legal conclusions, 'is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.' To determine when a question posed to an expert witness calls for an improper legal conclusion, the district court should consider first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second, whether any terms employed have specialized legal meaning.

*United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (citations omitted). Here, plaintiff attempts to use Hibbard and Swain to express the legal conclusion that consumer confusion exists in this case. Although an expert's testimony is generally "not objectionable because it embraces an ultimate issue to be decided by the trier of fact," such testimony must nonetheless be "otherwise admissible." Fed. R. Evid. 704 (a). Despite the fact that FRE 704 (a) abolishes the "ultimate issue" rule, it "'does not lower the base so as to admit all opinions.' As a condition to admissibility under Rule 704 (a), testimony on ultimate issues must be otherwise admissible under the Rules of Evidence." *Barile*, 286 F.3d at 759 (citation omitted). "Expert testimony on

16

an ultimate issue is therefore excludable under *Rule 702* if it does not aid the jury." *Barile*, 286 F.3d at 760.

Third, Hibbard and Swain's testimony does not aim to solicit information, but rather provides mere sweeping conclusions that "would supply the jury with no information other than the expert's view of how its verdict should read." *Barile*, 286 F.3d at 760. The issue of whether the marks are confusingly similar is an issue "the jury, by virtue of common experience, is capable of resolving [as] a factual issue." *See also Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986). To allow expert testimony on commonly known principles invites an "evaluation of the commonplace by an expert witness [that] might supplant a jury's independent exercise of common sense." *Scott*, 789 F.2d at 1055 (error to allow "human factors" expert to testify that higher, nearer curb section displaced further curb section and that statistically persons wearing heels tend to avoid walking on grates; prejudicial error to allow same expert to testify spalling of concrete was effective distraction and that scene was an "accident waiting to happen"). In fact, "when stripped of its technical gloss," the Marketing Experts' opinions do "no more than state the obvious." *Persinger v. Norfolk & Western Railway Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990) (expert's testimony regarding a formula "based on several basic variables including the distance of the lift, and the distance from the body at which the weight was held" inadmissible as typical juror knows it is more difficult to lift objects from a seated position).

For example, regarding Swain's opinion on the use of acronyms or initialism, it is common knowledge that people associate an abbreviation with the phrase for which it stands. Swain then takes this common principle to speculate that there must therefore be consumer confusion, without having spoken to a single consumer. As a second example, regarding Hibbard's use of the "4P's," a jury is just as capable of comparing the parties' dice and chips, the

color palettes used on the parties' packaging, and the pricing of the parties' games. Notably, if the jury were to compare, for instance, the color palettes and pricing of the parties games, they would likely conclude the colors and prices are not similar. This example particularly underscores the danger of the Marketing Experts' supplanting the function of the jury as fact finder in this case.

Because Swain and Hibbard's evidence is irrelevant, an attempt to testify to mere legal conclusions, and within the common knowledge of jurors, it is of no assistance and thus inadmissible under FRE 702 and 704. *See Persinger*, 920 F.2d at 1188; *see also Scott*, 789 F.2d at 1055.

## II. *HIBBARD AND SWAIN'S REPORT AND TESTIMONY SHOULD BE EXCLUDED AS INSUFFICIENT UNDER* DAUBERT *AND SPECULATIVE*

Swain and Hibbard's conclusions are not supported by reliable scientific evidence, but are rather a subjective and unreliable "analysis" of irrelevant information, speculation and commonly expressed principles. Indeed, Hibbard and Swain agree that they did not undertake a survey or scientific sample. The Court should exclude the Hibbard and Swain's report and testimony pursuant to its gatekeeping function of determining "whether that reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the fact at issue." *Daubert*, 509 U. S. at 592-593. Under Federal Rule of Evidence 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

F.R.E. 702.

18

The rationale behind Rule 702 is an acknowledgment that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. Presumably, this relaxation of the usual requirement of firsthand knowledge...is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. In analyzing expert evidence under *Daubert*, some key areas of inquiry for the court are: (1) whether the knowledge can be tested, to see if the hypotheses and opinions can be falsified; (2) whether the theory or methodology has been subjected to peer review or publication; (3) consideration of the known or potential rate of error; and (4) a "general acceptance" or "reliability" analysis. *Daubert*, 509 U.S. at 593-594. This analysis goes to the "scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on the principles and methodology, not the conclusions they generate. *Daubert*, 509 U.S. at 594.

Rule 702 and *Daubert* go hand-in-hand with Rule 703's requirement that "expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Daubert*, 509 U.S. at 595. In full, Rule 703 states:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or evidence unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

F.R.E. 703.

Neither Swain nor Hibbard use an objective methodology that could be proven or disproven, or that has scientific validity that would demonstrate evidentiary relevance and reliability. Rather, each of them engage in speculation and give purely subjective opinions.

As to Swain and his opinion that consumers are likely to confuse the parties' marks, it is most telling that the underlying data contains absolutely no contact with consumers. The experts specifically did not conduct a survey or scientific sample. When calling stores, the experts never asked about confusion between the names. In fact, the experts never came across anyone who did actually confuse the names. Even more disturbing is Swain's opinion about initialism and anacronyms. Despite the fact that he does not know if "LCR" or "Left Center Right" came first in the market place, and the fact that he has never seen a scenario in which use of an anacronym predated the use of the phrase for which it stands, he nonetheless chooses to speculate that consumers will confuse the two marks in this case.

As to Hibbard, there is at least some framework for his testimony with the "4-Ps." However, all of the information in the framework is information within the common knowledge of the jury. Hibbard's "evaluation" of the information in the framework to determine whether market overlap is "substantial" is purely subjective and subject to no methodology whatsoever. This amounts to pure speculation. However, "expert opinion must be based on scientific, technical, or other specialized knowledge *and not on belief or speculation.*" *O'Neill v. Windshire-Copeland Associates, LP, et al.*, 372 F.3d 281, 285 (4th Cir. 2004) (court upheld exclusion of biomechanics professor's testimony that plaintiff's fall was "much more likely" to have been cause by wind because "it does not appear likely" that someone of plaintiff's skill and ability would accidentally lean too far backwards and lose balance).

In short, with Hibbard and Swain's proffered testimony, plaintiff is merely making a backdoor attempt to allow unreliable, subjective, non-scientific opinions to get to the jury.

## III.   HIBBARD AND SWAIN'S REPORT AND TESTIMONY SHOULD BE EXCLUDED AS PREJUDICIAL

A final step in analyzing expert evidence is a determination under Rule 403 of whether the expert evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." *Daubert*, 509 U.S. at 595. Courts must take particular caution in analyzing expert evidence, as it "can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citation omitted).

As discussed above, Hibbard and Swain's testimony have little if any probative value on the issues of alleged trademark infringement in this case. However, because plaintiff proffers them as "experts," the risk of prejudice, including the risk of confusing the issues and misleading the jury, is tremendous.

## CONCLUSION

On the basis of the foregoing, Defendants Imagination Entertainment Limited, Imagination Holdings Pty Ltd. and Imagination DVD, Inc. request that this Court exclude the report and bar the testimony of plaintiff's marketing experts because such evidence is irrelevant and will not aid the jury, is speculative and insufficient pursuant to *Daubert* and is prejdicial, and award Defendants Imagination Entertainment Limited, Imagination Holdings Pty Ltd. and Imagination DVD, Inc. their costs, attorneys' fees, and other expenses.

Respectfully submitted,

/s/ William F. Krebs
William F. Krebs, Esquire
Virginia Bar No. 17347
James R. Schroll, Esquire
Virginia Bar No.19646
Christopher A. Glaser, Esquire
Virginia Bar No. 43491
Attorney for Defendants Imagination
Entertainment Ltd., Imagination Holdings
Pty Ltd. and Imagination DVD, Inc.
BEAN, KINNEY & KORMAN, P.C.
2300 Wilson Blvd., Seventh Floor
Arlington, VA 22201
Phone:   703-525-4000
Fax:       703-525-2207
wkrebs@beankinney.com

22

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th Day of October 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will then send a notification of such filing to the following:

Monica Riva Talley, Esquire
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Ave, N.W.
Washington, DC 20001-4413
Counsel for Plaintiff

And I certify that I electronically served the foregoing to the following non-filing users:

Douglas A. Rettew, Esquire
Mark Sommers, Esquire
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Ave, N.W.
Washington, DC 20001-4413
Co-Counsel for Plaintiff

And

Jennifer L Whitelaw, Esquire
WHITELAW LEGAL GROUP
3838 Tamiami Trial North, Third Floor
Naples, FL 34103
Co-Counsel for Plaintiff

/s/ William F. Krebs
William F. Krebs, Esquire
Virginia Bar No. 17347
Attorney for Defendants Imagination
Entertainment Ltd., Imagination Holdings
Pty Ltd. and Imagination DVD, Inc.
BEAN, KINNEY & KORMAN, P.C.
2300 Wilson Blvd., Seventh Floor
Arlington, VA 22201
Phone:  703-525-4000
Fax:     703-525-2207
wkrebs@beankinney.com