**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

GEORGE & COMPANY LLC,

               Plaintiff,

v.

IMAGINATION ENTERTAINMENT LIMITED,
IMAGINATION HOLDINGS PTY LTD., and
IMAGINATION DVD, INC.,

               Defendants.

Civil Action 1:07CV498

Judge Brinkema

Mag. Judge Jones

## <u>GEORGE & CO.'S PROPOSED FINAL JURY INSTRUCTIONS</u>

Monica Riva Talley, Esq. (VA 41840)
Douglas A. Rettew, Esq.
Mark Sommers, Esq.
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, D.C.  20001-4413
Tel:  (202) 408-4000
Fax:  (202) 408-4400
Email:  monica.talley@finnegan.com

Attorneys for Plaintiff
George & Company LLC

Of Counsel:

Jennifer L. Whitelaw, Esq. (FL 0938629)
WHITELAW LEGAL GROUP
3838 Tamiami Trail North, 3rd Floor
Naples, FL  34103
Tel:  (239) 262-1001
Fax:  (239) 261-0057

1.     **GENERAL INSTRUCTIONS**

1.1    **INTRODUCTION**

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.  I will start by explaining your duties and the general rules that apply in every civil case.  Then I will explain some rules that you must use in evaluating particular testimony and evidence.  Then I will explain the positions of the parties and the law you will apply in this case.  And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.  You will have a written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form, which will list the interrogatories, or questions, that you must answer to decide this case.

SOURCE:  Adapted from the Jury Instructions given in <u>Arnott v. Alcon</u>, C.A. 91-729-A (E.D. Va. Jan. 15, 1992) ("<u>Arnott v. Alcon</u>"), and from Jury Instructions given in <u>Surety Technologies, Inc. v. Entrust Technologies, Inc.</u>, C.A. 99-203-A (E.D. Va. Nov. 2, 1999) ("<u>Surety Technologies</u>").

1

**1.2      JURORS' DUTIES**

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, by the appropriate burden of proof, if there is any liability and damages.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you.  This includes the instructions that I gave you before and during the trial, and these instructions.  All the instructions are important, and you should consider them together as a whole.  The order in which the instructions are given in this case should not be considered by you, the jurors, to indicate that any part of these instructions is any more important than any other part of the instructions.  You are not to question the wisdom of any rule of law stated by the court even if you personally disagree with it.

Perform your duties fairly.  Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

SOURCE:  Arnott v. Alcon, Surety Technologies, and Federal Jury Practice and Instructions, Fifth Ed., (O'Malley, Grenig & Lee, Eds. 2000) §§ 103.01, 103.12 (2000) ("Federal Jury Practice").

**1.3      EVIDENCE DEFINED**

You must make your decision based only on the evidence that you saw and heard here in court.  Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted or stipulated to.  You will have the exhibits in the jury room, and those are considered direct forms of evidence.  Arguments and statements of counsel are not evidence in the case.

The lawyers may from time to time have referred to certain facts that came out in the evidence.  If your recollection of those facts is different from the lawyers, your recollection prevails, because you are the sole judges of the facts in this case.

When the court has sustained an objection to a question addressed to a witness, you must disregard the question entirely.  You may draw no inference from the wording of the question or speculate as to what the witness would have said if he or she had been permitted to answer the question.

During the course of the trial I occasionally may have asked questions of a witness in order to bring out facts not then fully covered in the testimony.  Do not assume that I hold any opinion on the matters to which my questions may have related.  Remember at all times that you as jurors are at liberty to disregard all comments of the court in arriving at your own finding as to the facts.

SOURCE:  <u>Arnott v. Alcon</u> and <u>Federal Jury Practice</u>, §§ 103.30, 103.33.

**1.4     CONSIDERATION OF EVIDENCE**

You should use your common sense in weighing the evidence.  Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

SOURCE:  <u>Arnott v. Alcon</u>, <u>Surety Technologies</u>.

**1.5    DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Now, there are generally speaking two types of evidence that a jury may properly use to find the truth as to the facts of the case: "direct evidence" and "circumstantial evidence." Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

SOURCE:  Arnott v. Alcon, Surety Technologies, and Federal Jury Practice, §§ 104.05, 101.42.

**1.6     STIPULATIONS**

A number of facts in this case are undisputed.  This means that both parties agree on these facts.  Other facts have been admitted during the pretrial discovery process.  You should treat these undisputed or admitted facts as true, proper evidence for the purposes of this case.

SOURCE:  <u>Federal Jury Practice</u>, §§ 101.48.

**1.7     CREDIBILITY OF WITNESSES**

You are the sole judge of the credibility of the witnesses.  You may be guided by the appearance and conduct of the witnesses or by the manner in which the witness testifies or by the character of the testimony given or by evidence to the contrary of the testimony given.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence that tends to show whether a witness is worthy of belief.  Consider each witness' knowledge, motive, state of mind and demeanor and manner while on the stand, and whether the witness impresses you as having accurate recollection of these matters.  Consider, also, any relation each witness may bear to either side of the case, the manner in which each witness might be affected by the verdict and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to discredit such testimony.  Two or more persons witnessing an incident or a transaction may see or hear it differently; and innocent mis-recollection, like failure of recollection, is not an uncommon experience.  In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or to an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood.

You may accept or reject the testimony of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact.  You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

Now, a witness may be discredited or impeached by contradictory evidence or by evidence that at some other time the witness has said or done something or failed to say or do something that is inconsistent with the witness' present testimony.

If you believe that any witness has been impeached and, thus, discredited, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.  Before discounting a witness' testimony for this reason, you ought to consider whether the inconsistencies or the inconsistency was of a minor, insignificant nature or something material to the case.

And if a witness is shown knowingly to have testified falsely concerning material matter, you have a right to distrust such witness' testimony in other particulars, or you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

Now, as I indicated to you earlier, in passing on the credibility of a witness, you may consider whether that witness has any bias or interest in the outcome of the case and, if so, whether he or she has permitted that bias or interest to color his or her testimony.

It does not follow simply from the fact that a witness does have a bias or interest in the outcome of the case that his or her testimony is to be disbelieved.  There are many people, who, no matter what their interest in the outcome of the case may be, would not testify falsely.  On the other hand, you should always bear in mind that if a witness has a decided bias or interest in the outcome of the case, that may offer something of a temptation to shade the testimony in accordance with that bias and sway that witness to advance his or her interests.

If any witness' credibility you are testing has some bias or interest in the outcome of the case, that fact is one you can take into consideration in weighing the testimony.

SOURCE:  <u>Arnott v. Alcon</u>, <u>Surety Technologies</u>, and <u>Federal Jury Practice</u>, § 105.01.

**1.8    EXPERT WITNESSES**

You have heard testimony from persons who profess to be expert witnesses, witnesses who by education and experience have become qualified as an expert in some art, science, profession, or calling.  And they may state their opinion as to relevant material matters in which they profess to be expert and may also state their reasons for their opinion.

Expert opinion testimony should be judged just as any other testimony.  Thus, you should consider each expert opinion received in this case and give it such weight as you may think it deserves.  If you should find that the opinion of an expert witness is not based on sufficient education or experience, or if you should conclude that the reasons given in support of the opinion of the theory used to arrive at the opinion are not sound or that the opinion is outweighed by other evidence, you may disregard the opinion entirely.

It is customary and accepted for an expert witness to be compensated for services.  No possible suggestion of impropriety results from the compensation for the services of an expert witness, including compensation for giving testimony at trial.

SOURCE:  Fed. R. Evid. 702; <u>Arnott v. Alcon</u>, and <u>Federal Jury Practice</u> § 104.40.

**1.9      DEPOSITION TESTIMONY**

Some of the witnesses that testified appeared here in Court.  Others testified through depositions that were either read in court or played on videotape.  Deposition testimony is entitled to the same consideration and is to be judged as to credibility and weighed and otherwise considered by you in the same way as if the witness had been present and had testified from the stand.  Like the testimony of a live witness, the statements made in a deposition are made under oath and are considered evidence that may be used to prove particular facts.

SOURCE:  Arnott v. Alcon, Surety Technologies, Federal Jury Practice, § 105.02.

10

**1.10    DEMONSTRATIVE EXHIBITS**

During the course of the trial, you have seen many exhibits.  Many of these exhibits were admitted as evidence.  You will have these admitted exhibits in the jury room for your deliberations.  The remainder of the exhibits (including charts) were offered to help illustrate the testimony of various witnesses.  These illustrative exhibits, called demonstrative exhibits, have not been admitted, are not evidence, and should not be considered as evidence.  Rather it is the underlying testimony of the witness that you heard and the documents that were admitted into evidence when you saw the demonstrative exhibits that is the evidence in the case.

SOURCE:  <u>Federal Jury Practice</u>, § 104.50.

**1.11    BURDENS OF PROOF**

This is a civil case in which the plaintiff, George & Co. (who I will refer to as "George") is charging the defendants, Imagination Entertainment Limited, Imagination Holdings Pty Ltd., and Imagination DVD, Inc., (who I will refer to as "Imagination"), with trademark infringement, unfair competition, and Internet domain name cybersquatting.  Imagination denies all of these claims.

George has the burden of proving its infringement claims by what is called a preponderance of the evidence.  That means George has to produce evidence which, when considered in light of all of the facts, leads you to believe that what George claims regarding infringement is more likely true than not.  To put it differently, if you were to put George's and Imagination's evidence on the issue of infringement on the opposite sides of a scale, the evidence supporting George's claims of infringement would have to make the scales tip to its side.  If George meets this burden, your verdict on infringement must be for George.  If George fails to meet this burden, your verdict on infringement must be for Imagination.

Imagination has raised certain "affirmative defenses," upon which it bears the burden of proof, also by a preponderance of the evidence, which I just discussed.

Those of you familiar with criminal cases will have heard the term "proof beyond a reasonable doubt."  That burden does not apply in civil cases, and you should therefore put it out of your mind in considering whether George and Imagination have met their burdens of proof.

SOURCE:  <u>Arnott v. Alcon</u>, <u>Federal Jury Practice</u>, §§ 104.01, 104.02.

**2.     SPECIFIC INSTRUCTIONS**

**2.1     THE PARTIES AND CLAIMS**

I will now explain the claims that the plaintiff George has made against the defendant Imagination.  George contends that Imagination's use of the mark LEFT CENTER RIGHT, and Internet domain names containing that term and the term LCR, constitutes trademark infringement, unfair competition, false designation of origin, misappropriation, and cybersquatting.

Section 32(1) of the Lanham Act governs trademark infringement.  Section 32(1) makes unlawful the use of a "reproduction, counterfeit, copy, or colorable imitation" of a registered trademark in such a way as "is likely to cause confusion, or to cause mistake, or to deceive."[1]

Section 43(a) of the Lanham Act governs unfair competition, and protects against infringement of a trademark even if the mark has not been federally registered.[2]  Section 43(a) prohibits the use of an imitation of a mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."[3]

The common law of Virginia also prohibits trademark infringement and unfair competition.  Because the tests for trademark infringement and unfair competition under federal law and Virginia common law are essentially the same, with all addressing "likelihood of

---

[1] 15 U.S.C. § 1114(1).

[2] Teaching Co. v. Unapix Entm't, Inc., 87 F. Supp. 2d 567, 575 (E.D. Va. 2000).

[3] 15 U.S.C. § 1125(a).

13

confusion," a finding that George is entitled to succeed on the merits of its claim under Section 43(a) of the Lanham Act also establishes that George is likely to succeed on its common-law claims.[4]

To establish trademark infringement and/or unfair competition, George must show:  (1) ownership of a protectable trademark; and (2) a likelihood of confusion caused by defendant's use of its mark.  Lone Star, 43 F.3d at 930; Sweetwater, 266 F. Supp. 2d at 461.

The federal Anticybersquatting Consumer Protection Act prohibits the registration of a domain name that is identical or confusingly similar to a mark owned by another party, where that party has a "bad faith intent to profit" from using the domain name.[5]

I will now discuss the law that governs the protectability and ownership of trademarks.

---

[4] Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 930 n.10 (4th Cir. 1995); Sweetwater Brewing Co. v. Great Am. Rests., Inc., 266 F. Supp. 2d 457, 460-461 (E.D. Va. 2003).

[5] 15 U.S.C. § 1125(d)(1)(A); People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359 (4th Cir. 2001).

**2.2      TRADEMARKS IN GENERAL**

The first issue governing George's trademark infringement and unfair competition claims is whether George owns any protectable trademarks.  To make this determination, it is important that you know something about what a trademark is.  For the purposes of these instructions, I will use the terms "trademark" and "mark" interchangeably.

The term trademark includes any word, name, symbol, device, or any combination thereof used to identify and distinguish a company's goods from those made or sold by other companies, even if the specific source is unknown.[6]  Slogans, designs, and logos can serve as trademarks.[7]

A single product or service can have more than one trademark (including an accompanying slogan such as "FORD" and "TAURUS" for automobiles, "CAPITAL ONE" and "WHAT'S IN YOUR WALLET" for credit cards, and "AOL" and "AMERICA ONLINE" for Internet services.

The main function of a trademark is to designate goods as a particular company's product and to protect that company's goodwill.  A trademark is also a merchandising shortcut that allows a prospective purchaser to select what he or she wants.  Put another way, a trademark identifies a given good as the product of a particular company and allows people to select the

---

[6] 15 U.S.C. § 1127.

[7] J. Thomas McCarthy, 1 <u>McCarthy on Trademark and Unfair Competition</u>, §§ 7:20, 7:25 (4th ed. 2006).

particular brand they want to purchase.  Trademarks serve a public interest by avoiding public confusion as to the source of products.[8]

When a company has established a trademark right before anyone else, the company's right to use that mark becomes an exclusive right and the mark is the property of only that company.  No other person can use the same or a similar mark in any manner that would be likely to cause confusion, mistake, or deception.[9]

In this case, George claims it owns trademark rights in the following marks:

| George's Alleged Mark | Source of Rights |
|---|---|
| LCR | Registration No. 2,989,658 for "dice games, party games, and board games featuring specially marked dice and chips" |
|   ("LCR Rolling Dice Design") | Registration No. 2,802,321 for "dice games, party games, and board games featuring specially marked dice and chips" |

---

[8]  2 Duane Burton Jury Instructions in Intellectual Property Cases § 30:20:01 (2002) (citing Time, Inc. v. Petersen Pub. Co., 173 F.3d 113 (2d Cir. 1999)).

[9] Id.

| George's Alleged Mark | Source of Rights |
|---|---|
|  ("LEFT! CENTER! RIGHT! Dice, Chips, & Arrows Design") | Common-law use |
| LEFT, CENTER OR RIGHT - DON'T LOSE YOUR CHIPS! | Common-law use |
| LEFT CENTER RIGHT | Common-law use |

**2.3    REGISTERED TRADEMARKS**

If a mark is registered, the registration constitutes *prima facie* evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark throughout the United States.[10]

Here, the parties agree that George owns Registration No. 2,989,658 for the mark LCR and Registration No. 2,802,321 for the LCR Rolling Dice Design, and that these marks are valid and protectable.[11]

---

[10] 15 U.S.C. § 1057(b) (emphasis added); Emergency One, Inc. v. Am. Eagle Fire Apparatus Co., 332 F.3d 264, 268-69 (4th Cir. 2003) (noting that a federal trademark registration "constitutes prima facie evidence of the validity of the registered mark . . . of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark . . . throughout the nation.") (citations omitted).

[11] Docket No. 71 at ¶¶ 9, 10.

**2.4     COMMON-LAW TRADEMARKS**

Registration of a trademark is not needed to establish trademark infringement or unfair competition.[12]  However, because George's (1) LEFT CENTER RIGHT mark, (2)  LEFT, CENTER OR RIGHT - DON'T LOSE YOUR CHIPS! tagline, and (3) LEFT! CENTER! RIGHT! Dice, Chips, & Arrows Design are not federally registered, George must prove these marks are protectable.

George's rights in these marks are governed by common-law principles.  Under common law, a party acquires rights in a trademark by using it as a trademark.  In order to obtain trademark protection, a designation must identify one source and distinguish it from other sources.[13]

The owner of a common-law mark acquires both the right to use the particular mark and the right to prevent others from using the same or a confusingly similar mark.[14]

The use of "™" or other similar symbols does not confer any substantive trademark rights and is irrelevant to determining whether George has rights in any of its common-law marks.[15]

---

[12] Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-68 (1992).

[13] Microstrategy Inc. v. Motorola, Inc., 245 F.3d 335, 341 (4th Cir. 2001).

[14] Emergency One, Inc., 332 F.3d at 267.

[15] 1 McCarthy at 3:3 (use of a TM symbol does not grant trademark rights).

## 2.5     USE OF TRADEMARKS

George asserts that it has used its unregistered marks in ways that are sufficient to grant it trademark rights.  To show trademark use, George must establish (1) that it has used its marks in connection with a product or service, and (2) that its use of those marks is "readily apparent and recognizable" to consumers.[16]

As to the first factor, there is no dispute in this case that George has used its LEFT, CENTER OR RIGHT - DON'T LOSE YOUR CHIPS! tagline and LEFT! CENTER! RIGHT! Dice, Chips, & Arrows Design on product packaging, catalogs, and display racks as follows:[17]




---

[16]  <u>Microstrategy Inc. v. Motorola Inc.</u>, 245 F.3d 335, 342 (4th Cir. 2001) (citation omitted).

[17] Docket No. 71 at ¶¶ 5, 8.

As to the second factor, common hallmarks of trademark use include (1) larger-sized print, (2) initial capital letters, (3) distinctive print style or color, and (4) prominent positioning on product packaging.[18]

Regarding George's asserted rights in LEFT CENTER RIGHT *per se*, if members of the public call a product by a particular name or nickname, the public's use of that name creates trademark rights on the owner's behalf.[19]  Indeed, because Americans are prone to abbreviate recognized trademarks into nicknames (i.e., COKE for COCA-COLA), the law recognizes that those nicknames are just as entitled to legal protection as the original full trademark.[20] Trademark rights can therefore arise in a name used by the public to refer to a product, even if the trademark owner never used that exact name or phrase itself.[21]

George also asserts it used LEFT CENTER RIGHT *per se* on George's early packaging from approximately 1983-1991.  Whether George has trademark rights in LEFT CENTER RIGHT per se based on this early use is determined by the same test set forth above.

Verbal and word-of-mouth use of a trademark in bona fide commercial transactions can also support a claim of trademark rights.[22]

---

[18] 1 McCarthy at § 3:3.

[19] Nat'l Television Ass'n Inc. v. Am. Cinema Editors Inc., 937 F.2d 1572, 1577-78 (Fed. Cir. 1991).

[20] 1 McCarthy at § 7:18.

[21] 1 McCarthy at § 7:18; Louis Altman & Rudolf Callmann, 3 Callmann on Unfair Competition, Trademarks, and Monopolies, § 20:29, at 20-257 (4th 1983); Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., No. 97-C-155, 1998 U.S. Dist. LEXIS 11919, at * 44 (W.D. Wis. Jun. 24, 1998), aff'd, 188 F.3d 427, 434 (7th Cir. 1999).

[22] Allard Enters. v. Advanced Programming Res., Inc., 146 F.3d 350, 359-60 (6th Cir. 1998) (finding that defendant established priority rights through use of mark almost exclusively

(continued on next page)

**2.6     VALIDITY OF GEORGE'S COMMON-LAW MARKS**

In addition to use, George must show that its common-law marks are protectable.  A mark is considered protectable:  (1) if it is inherently distinctive, or (2) if it has acquired distinctiveness in the marketplace through use.  Acquired distinctiveness is also known as "secondary meaning."[23]

As to inherent distinctiveness, marks are classified along a spectrum according to various categories of distinctiveness.  These categories, in order of increasing distinctiveness, are:  (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful.[24]  Suggestive, arbitrary, and fanciful marks are considered inherently distinctive, while descriptive marks are not.[25]  Thus, while a suggestive mark is deemed to be presumptively protectable, a descriptive mark requires proof of secondary meaning (i.e., proof that consumers have come to associate the mark with a single source) before it can be considered protectable.[26]

Generic marks cannot be trademarks.  Neither party maintains that any of the marks involved in this case is generic.

Fanciful marks are made-up words solely created to serve as trademarks.  Some examples of fanciful marks are CLOROX, KODAK, POLAROID, and EXXON.[27]

---

(continued from previous page)
through word-of-mouth promotion and verbal solicitations with written use of mark on only one fax and one resume).

[23] Id. at 575-76.

[24] Two Pesos, 505 U.S at 768.

[25] Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir. 1996).

[26] Pizzeria Uno, 747 F.2d at 1527.

[27] 1 McCarthy § 11:03

Arbitrary marks are comprised of words in common usage, but, because they do not suggest or describe any quality, ingredient, or characteristic of the goods they identify, are said to have been arbitrarily assigned.  Examples include CAMEL cigarettes, APPLE computers, and IVORY soap.[28]

Suggestive marks connote, without describing, some quality, ingredient, or characteristic of the product they identify.  While a suggestive mark conjures up an image of the product to which it refers, it requires consumers to use their imagination to reach a conclusion as to the product's exact nature.  In other words, a person without actual knowledge of the product would have difficulty ascertaining its exact nature from the mark alone.[29]  Examples of suggestive marks are COPPERTONE for suntan lotion, ORANGE CRUSH for soda, APPLE-A-DAY for vitamins, and CITIBANK for an urban bank.

Accordingly, in the context of a game, a name can be considered suggestive if, upon encountering the game name, one would not have a clear idea of the game's characteristics or how the game is played.[30]  For example, CLUE is suggestive for a board game involving clues.[31]

In contrast to fanciful, arbitrary, and suggestive marks, descriptive marks are not inherently distinctive and merely describe a function, use, characteristic, size, or intended

---

[28] Id. at § 11:04.

[29] Id. at § 11:23.

[30] Stern Electronics, Inc. v. Kaufman, 523 F.Supp. 635, 640 (E.D.N.Y. 1981) (SCRAMBLE for a video game involving the "scramble" of aircraft engaged in battle is suggestive because the name does not give prospective customers an "immediate idea" of the characteristics of the game)

[31] Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 125-26 (D. Mass 1999) (CLUE for board game involving "clues" fits most readily into the category of suggestive marks because it "suggests mystery or detective work but requires the consumer's imagination to conclude that it refers to a mystery game").

purpose of a product.  Examples of descriptive marks include AFTER TAN for post-tanning lotion and YELLOW PAGES for a telephone directory.[32]

You are instructed that George's LCR marks are suggestive.  You therefore need only determine where George's other marks fall on the spectrum of distinctiveness.  George claims those other marks are suggestive, while Imagination claims they are merely descriptive.

---

[32] <u>McCarthy</u> at § 11:08.

**2.7   SECONDARY MEANING**

If you decide that LEFT CENTER RIGHT is descriptive, it may still be a protectable

trademark if it has acquired "secondary meaning."[33]  In determining whether LEFT CENTER

RIGHT has acquired secondary meaning, that is, that the relevant public associates this term with

one company (i.e., George), you may consider all the circumstantial evidence regarding the

manner in which George's game has been sold on the market.  No single factor is determinative.

In essence, you may consider all the evidence that would lead you to believe or not to believe

that the relevant public has come to associate LEFT CENTER RIGHT with a single source (i.e.,

George).[34]  Direct evidence of the use and understanding of a term by the public is the very

essence of secondary meaning.[35]

If a mark has been in substantially exclusive and continuous use for a period of five

years, the United States Patent and Trademark Office may accept such use as prima facie

evidence of secondary meaning.[36]

Moreover, evidence of actual confusion demonstrates that a mark has acquired secondary

meaning.[37]

---

[33] Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990); Sara Lee, 81 F.3d at 464.

[34] George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532 (2d Cir. 1992).

[35]  Contour Chair Lounge Co. v. True-Fit Chair, Inc., 648 F. Supp. 704, 713 (E.D. Mo. 1986) ("The essence of secondary meaning is the association in the mind of the public of [a mark] with a particular product and producer.") (citations omitted).

[36] 15 U.S.C. § 1052(f); Stuart Hall Co. v. Ampad Corp., 51 F.3d 780, 789 (8th Cir. 1995).

[37] Lone Star, 43 F.3d at 936 n.16; see also Stafford Urgent Care v. Garrisonville Urgent Care, 224 F. Supp. 2d 1062, 1065 (E.D. Va. 2002) (holding that "evidence of actual confusion on the part of consumers" is a factor that demonstrates secondary meaning); Estate of William F.

(continued on next page)

Finally, if you find that Imagination intentionally and directly copied any of George's marks, that also raises a presumption those marks have acquired secondary meaning.[38]

---

(continued from previous page)
Jenkins v. Paramount Pictures Corp., 90 F. Supp. 2d 706, 713 (E.D. Va. 2000) (same); 2 McCarthy at § 15:11.

[38] Larsen v. Terk Technologies, 151 F.3d 140, 148-49 (4th Cir. 1998).

**2.8**     **LIKELIHOOD OF CONFUSION**

Next, you must determine whether Imagination's use of LEFT CENTER RIGHT is likely to cause confusion with either of George's registered marks (LCR and the LCR Rolling Dice Design) and with any of George's unregistered common-law marks (assuming you find George has rights in those marks).[39]

To prevail, George need only show a *likelihood* of confusion, mistake, or deception with any one of its marks.[40]  George need not introduce *any* evidence of actual confusion or economic harm.[41]  This is because the likelihood of confusion, on its own, is prohibited by the trademark laws.[42]  However, when evidence of actual confusion is present, it is entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion.[43]

The trademark laws guard against likely confusion not only as to the source of products, but also as to their sponsorship, affiliation, or approval.[44]  Thus, a likelihood of confusion can

---

[39] Lone Star, 43 F.3d at 930; Sweetwater, 266 F. Supp. 2d at 461.

[40] 15 U.S.C. § 1125(a).

[41] Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 291 (3d Cir. 2001); Waples-Platter Cos. v. General Foods Corp., 439 F. Supp. 551, 585 (N.D. Tx. 1977) ("Where there is a likelihood of confusion over the origin of a subsequent user's products, the prior user is entitled to prohibitive injunctive relief against the use of his mark by the subsequent user, regardless of whether or not actual confusion, actual economic harm, or bad faith has been shown.").

[42] James Burrough Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 276 (7th Cir. 1976) (holding that economic harm per se is not required for liability because damage is presumed from the likelihood of confusion) (internal citations omitted).

[43] Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 937 (4th Cir. 1995).

[44] 15 U.S.C. § 1125(a).

exist not only when people encountering the product are likely to believe it is *produced* by someone other than the actual manufacturer, but when people believe the product is in some way associated or connected with another company.[45]  For instance, if people upon encountering a product believe it is licensed from another company, when in fact it is not, a likelihood of confusion exists.[46]

The trademark laws prohibit several types of likely confusion.  Four are involved in this case:  (1) likelihood of forward confusion; (2) likelihood of reverse confusion; (3) likelihood of post-sale confusion; and (4) likelihood of initial-interest confusion.

---

[45] AMP, Inc. v. Foy, 540 F.2d 1181, 1184 (4th Cir. 1976) ("[Under the Lanham Act, the] public is protected from being confused as to the sponsorship of goods or services purchased."); Black & Decker (U.S.) Inc. v. Pro-Tech Power, 26 F. Supp. 2d 834, 852 (E.D. Va. 1998) ("[The likelihood of confusion] inquiry asks whether the purchasing public is likely to mistake the source of particular goods, or to assume some association, relationship, or sponsorship between the parties or their goods when no such association actually exists.").

[46] Id.

## 2.9    FORWARD CONFUSION

Concerning the likelihood of forward confusion, George asserts that Imagination's use of the mark LEFT CENTER RIGHT is likely to cause people to mistakenly believe that George is the source of Imagination's game, or that George sponsored, licensed, or otherwise approved Imagination's game.

## 2.10    REVERSE CONFUSION

Likelihood of confusion can also occur through "reverse confusion."[47]  Reverse confusion occurs if people, upon encountering George's marks, mistakenly believe that George's dice game is made by, affiliated with, or licensed by Imagination.[48]  As a result, George loses the value of its trademark, product identity, control over its goodwill and reputation, and ability to enter into new markets.[49]  Reverse confusion protects trademark owners from this harm and protects smaller senior users against larger, more powerful companies who want to use identical or confusingly similar trademarks.[50]

---

[47] A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 228 (3d Cir. 2000).

[48] See A&H Sportswear, 237 F.3d at 238.

[49] Id.

[50] A&H Sportswear, 237 F.3d at 22d (citing Fisons Horticulture v. Vigoso Indus., 30 F.3d 466, 475 (3d Cir. 1994)).

## 2.11   INITIAL INTEREST CONFUSION

Trademark infringement can also be based upon confusion that creates initial customer interest, even if the confusion is ultimately cleared up and no purchase is ever made.[51]

---

[51] 3 <u>McCarthy</u> § 23:6; <u>Gov't Emples. Ins. Co. v. Google, Inc.</u>, 77 U.S.P.Q.2d 1841 (E.D. Va. Aug. 8, 2005).

## 2.12   POST-SALE CONFUSION

Likelihood of confusion can occur not only at the point of sale, but also in the post-sale context.[52] The likelihood of post-sale confusion can occur among people who never actually purchase either party's game but who merely observe either game in use by others (such as when the game is played among friends) and:

(1) upon seeing Imagination's game in use, mistakenly believe the game is produced by, affiliated with, or licensed by George; or

(2) upon seeing George's game in use, mistakenly believe the game is produced by, affiliated with, or licensed by Imagination.

---

[52] Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) (finding that where counterfeit shirts bore mark confusingly similar to Ralph Lauren's polo player mark, the fact that labels inside shirt collars identified manufacturer as someone other than Ralph Lauren did not preclude likelihood of confusion in post-sale context); Nabisco Brands, Inc. v. Conusa Corp., 722 F. Supp. 1287 (M.D.N.C. 1989), aff'd, 892 F.2d 73 (4th Cir. 1989); see also McNeil-PPC, Inc. v. Granutec, Inc., 919 F. Supp. 198 (E.D.N.C. 1995) ("Confusion in the post-sale context is clearly actionable under the Lanham Act."); see also Insty Bit v. Poly-Tech Indus., Inc., 95 F.3d 663 (8th Cir. 1996) ("[T]he Lanham Act protects post-sale as well as point-of-sale confusion… [A]n action for trademark infringement may be based on the confusion of consumers other than direct purchasers, including observers of an allegedly infringing product in use by a direct purchaser."); See also Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc., 944 F.2d 1446 (9th Cir. 1991) (finding infringement noting that while the purchaser of an OSCAR look-alike award would know it is not a genuine OSCAR, "a large secondary audience" of recipients and viewers "might conceivably assume the [defendant's] Award was somehow associated with the Oscar"); Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts, 944 F.2d 1235 (6th Cir. 1991) (finding a likelihood of confusion among those who observed defendant's auto replica of a famous FERRARI sports car and noting that "[t]he Lanham Act… was intended to do more than protect consumers at the point of sale").

**2.13   LIKELIHOOD OF CONFUSION FACTORS**

Now that I have explained to you the types of likely confusion that are unlawful, I will

discuss the test for determining whether there is a likelihood of confusion.  To determine whether

a likelihood of confusion exists, you should consider the following nine factors[53]:

1.      The strength or distinctiveness of George's mark;

2.      The similarity of the marks used by George and Imagination;

3.      The similarity of the goods the parties' marks identify;

4.      The similarity of the facilities the parties use in their businesses;

5.      The similarity of the advertising the parties use;

6.      Imagination's intent;

7.      Actual confusion;

8.      The quality of Imagination's product; and

9.      The sophistication of the consuming public.

---

[53] <u>Pizzeria Uno Corp. v. Temple</u>, 747 F.2d 1522, 1527 (4th Cir.  1984) (stating factors 1-7), and
<u>Sara Lee</u>, 81 F.3d at 463-64 (adding factors 8 and 9).

Not all factors carry equal relevance, nor do all factors apply in each case.[54] Also, George need not prove that each and every factor weighs in its favor to establish a likelihood of confusion.[55]

---

[54] <u>Pizzeria Uno</u>, 747 F.2d at 1527.

[55] <u>Synergistic</u>, 470 F.3d at 171.

## 2.14   FACTOR 1 - STRENGTH OF GEORGE'S MARKS

The strength of a mark is the degree to which a consumer, upon encountering the mark, would associate the mark with a unique source.[56]  Strength is evaluated in terms of (1) conceptual (or inherent) strength and (2) commercial strength.

Conceptual strength refers to the classification of a mark in one of the following four groups, listed from strongest to weakest: (1) fanciful or arbitrary, (2) suggestive, (3) descriptive, and (4) generic.[57]  I discussed the meaning of these classifications earlier.

The parties agree that George's LCR mark is suggestive.[58]  Suggestive marks are considered strong, distinctive, and entitled to a broad scope of protection.[59]  You are to determine the inherent strength of George's other alleged marks.

Marketplace strength is determined by the following factors:  length of use of a mark, amount of sales under the mark, amount of advertising under the mark, and public recognition under the mark.[60]  If these numbers are large, they serve as evidence that the mark is strong.[61]

---

[56] CareFirst of Maryland, Inc. v. First Care, P.C., 434 F.3d 263, 269 (4th Cir. 2006) (citation omitted).

[57] Two Pesos, Inc., 505 U.S. at 768.

[58] Docket No. 105, Defs.' Mem. in Supp. of Mot. for S.J. at 19.

[59] Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 465 (4th Cir. 1996) (mark found suggestive and "therefore a strong, distinctive mark"); Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir.  1984) ("a mark which is either suggestive or arbitrary is strong and presumptively valid") (citation omitted); Teaching Co. v. Unapix Entm't, Inc., 87 F. Supp. 2d 567, 576 (E.D. Va. 2000) (a "suggestive mark is strong and presumptively valid"); B & B Hardware, Inc. v. Hargis Industries, Inc., 252 F.3d 1010, 1012 (8th Cir. 2001) ("Suggestive marks are entitled to broad trademark protection.").

[60] A&H Sportswear, 237 F.3d at 224; Bebe Stores, Inc. v. The May Department Stores Int'l, Inc., 2002 U.S. Dist. LEXIS 20463, at * 33 (E.D. Mo. 2002).

An active program of prosecuting infringers enhances the strength of a mark.  The law imposes a duty on trademark owners to be pro-active in policing the relevant market for infringers.[62]

---

(continued from previous page)
[61] Id.

[62] 2 McCarthy at § 11:91; Morningside Group Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133 (2d Cir. 1999).

## 2.15    FACTOR 2 - SIMILARITY OF THE MARKS

The second likelihood-of-confusion factor is the similarity of the parties' marks.  In evaluating similarity, you should not compare the marks "side-by-side."[63]  Rather, the proper test is whether the average person, encountering one of the marks in isolation in the marketplace, and having only a general recollection of the other, would likely confuse the two.[64]

While marks must generally be considered as a whole,[65] you should focus more on the similarities than the differences.[66]

In evaluating similarity, you should evaluate the impression that each mark is likely to have on a purchaser exercising the attention usually given by purchasers of such products.[67]  Similarity can be found if the overall impression created by the marks is essentially the same.[68]

To the extent any of the marks have dominant portions (i.e., portions that are set apart or otherwise emphasized), you should focus on those dominant portions in your comparison.[69]  The first part of a mark is often the most dominant portion because it is the part most likely to be impressed upon the mind of a purchaser and remembered in creating a commercial impression.[70]

---

[63] What-A-Burger Of Virginia, Inc. v. Whataburger, Inc. Of Corpus Christi, Texas, 357 F.3d 441, 450 (4th Cir. 2004).

[64] Id. at 477-78; Checkpoint, 269 F.3d at 281.

[65] Sweetwater, 266 F. Supp. 2d at 462.

[66] V&S Vin & Sprit Aktiebolag v. Hanson, No. 00-164-A, 2001 U.S. Dist. LEXIS 24848, at * 10-11 (E.D. Va. Oct. 16, 2001).

[67] Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1097 (8th Cir. 1996).

[68] Checkpoint Sys. v. Check Point Software Techs.,Inc., 269 F.3d 270, 281 (3d Cir. 2001).

[69] Id. (citing Lone Star, 43 F.3d at 936); Sweetwater, 266 F. Supp. 2d at 463.

[70] Presto Prods., Inc. v. Nice-Pak Prods., Inc., 9 USPQ.2d 1895, 1897 (TTAB 1988).

(continued on next page)

Similarity can be found where one term is an abbreviation of the other[71] or where two terms have a shared meaning.[72]  Where two terms have the same meaning, this can be a sufficient basis for finding similarity, even if the marks sound and look different.[73]

Where products are promoted by word-of-mouth (which the parties agree is the case here),[74] visual differences in the marks and product packaging can be discounted or disregarded.[75]

_____

(continued from previous page)

[71] See Purolator Inc. v. EFRA Distribs., Inc., 687 F.2d 554, 560 (1st Cir. 1982).

[72] 3A Callmann at § 21:18.

[73] Hancock v. American Steel & Wire Co. of N.J., 203 F.2d 737, 935-36 (CCPA 1953) (confusion between "Cyclone" and "Tornado" likely because the "popular or ordinary meanings of [the words] are identical"); Kraft-Phenix Cheese Corp. v. R.E. Robertson, Inc., 9 F. Supp. 125, 125 (E.D. Mich. 1934) (consumers likely to be confused between "Miracle Whip" and "Wonder Mix" because there is "little difference in meaning" between the words "Miracle" and "Wonder"); American Technical Industries, Inc v. General Foam Plastics Corp., 200 U.S.P.Q. (BNA) 244, 247 (S.D.N.Y. 1978) ("Mountain-King" and "Alpine Emperor" essentially synonymous and thus "very likely to confuse the public as to the source of the product.").

[74] Docket No. 71, ¶ 60.

[75] Avent Am., Inc. v. Playtex Prods., Inc., 68 F. Supp. 2d 920, 925-26 (N.D. Ill. 1999) (noting the importance of word-of-mouth referrals to both plaintiff and defendant and therefore discounting the dissimilarity between the appearance of their marks and packaging); Meridian Mutual Insurance Co. v. Meridian Insurance Group, Inc., 128 F.3d 1111, 1116 (7th Cir. 1997) (finding that visual distinctions between the parties' marks were irrelevant because the record showed that the marks were likely to be used in telephone calls).

Use of a house mark (i.e., "Imagination") on product packaging may not lessen confusion, and in some instances may actually increase confusion if it suggests a licensing relationship.[76]

---

[76] See, e.g., Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1088-89 (7th Cir. 1988) (explaining that even if the relevant consumers "attached any meaning to the defendants' house mark, they would necessarily believe that the [plaintiff] had licensed, approved or otherwise authorized the defendant's use of [the infringing name]"); Banff Ltd. Federated Department Stores Inc., 638 F. Supp. 652, 656 (S.D.N.Y. 1986), aff'd in part, rev'd in part, 841 F.2d 486 (2d Cir. 1988) ("[T]he use of a defendant's own name in conjunction with an otherwise similar mark does not generally excuse the infringement since it may instead simply increase the misappropriation by linking the defendant's own name to the plaintiff's good will established by its trademark."); 4 McCarthy at § 23:43 (explaining that "a junior user cannot justify its confusing use of another's mark simply by tacking on its own house mark or trade name" because "[s]uch a usage may merely suggest to consumers that plaintiff has licensed defendant or that the parties are affiliated in some other way").

**2.16    FACTOR 3 - SIMILARITY OF THE PARTIES' GOODS**

The third likelihood-of-confusion factor is the similarity of the parties' products.  The greater the similarity between the products, the greater the likelihood of confusion.[77]  Where the products are closely related, less similarity between the marks is needed to support a finding of infringement.[78]  In this case, the parties agree their respective games contain the same components (in number and type) and are played the same way.[79]

---

[77] Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188, 202 (5th Cir. 1998).

[78] SquirtCo at 1091.

[79] Docket No. 71 at ¶ 84.

**2.17   FACTOR 4 - SIMILARITY OF THE FACILITIES USED IN THE PARTIES' BUSINESS**

The fourth likelihood-of-confusion factor is the similarity of the facilities the parties use in their business.  In evaluating this factor, you should consider (1) whether the same classes of people purchase the parties' games; (2) whether the parties' games are sold in the same types of stores, in overlapping stores, or on the same websites; (3) whether the parties' games are sold in the same or similar price ranges; and (4) whether the parties' products are directed to the same consumer segment.[80]  The greater the similarity on these points, the greater the likelihood of confusion.[81]

---

[80] Renaissance Greeting Cards, 227 Fed. Appx. at *15.

[81] IDV North America, Inc. v. S & M Brands, Inc., 26 F. Supp. 2d 815 (E.D. Va. 1998).

**2.18    FACTOR 5 - SIMILARITY OF THE PARTIES' ADVERTISING**

The fifth likelihood-of-confusion factor is the similarity of the advertising the parties use to promote their products.  The use of identical or similar advertising methods is strong evidence of likelihood of confusion.[82]  The parties agree their games are both promoted by word-of-mouth.

---

[82] Teaching Co., 87 F. Supp. 2d at 582, citing Pizzeria Uno, 747 F.2d at 1535.

## 2.19    FACTOR 6 - IMAGINATION'S INTENT

The sixth likelihood-of-confusion factor is Imagination's intent.  When a defendant adopts a mark with actual or constructive knowledge of the plaintiff's mark or in reckless disregard of the plaintiff's rights, bad-faith intent is inferred.[83]  Constructive knowledge means knowledge one would acquire while exercising reasonable care.[84]

Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind.  But you may infer a party's intent from surrounding circumstances.  You may consider any statement made or act done or admitted by a party whose intent is at issue and all other facts and circumstances which indicate that state of mind.[85]

You may consider it reasonable to draw the inferences and find that a party intends the natural and probable consequences of acts knowingly done or knowingly admitted.  It is for you to decide what facts have been established by the evidence.[86]

Failure to conduct a trademark search or to rely on the advice of counsel when selecting a trademark may be considered evidence of bad faith or willful infringement.[87]

---

[83]  Teaching Co., 87 F. Supp. 2d at 583 (citing Beer Nuts, Inc. v. Clover Club Foods, Co., 805 F.2d 920, 927-28 (10th Cir. 1986)); Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 799 (4th Cir. 2001) (bad faith exists where "the defendant: (1) has either actual or constructive knowledge that its actions constitute infringement, or (2) recklessly disregards a copyright or trademark holder's rights.")

[84]  Black's Law Dictionary 284 (rev. 5th Ed. 1979).

[85]  2 Duane Burton Jury Instructions in Intellectual Property Cases § 30:51:79 (2002) (citing Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931 (7th Cir. 1989)).

[86]  Id.

[87]  Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 33 (1st Cir. 2002) (finding that the failure to conduct a trademark search was evidence, along with other behavior,

(continued on next page)

If a defendant is aware of the plaintiff's trademark, is asked to stop use by the plaintiff, and still continues to take affirmative steps to utilize the plaintiff's mark, bad faith may be presumed.[88]

In addressing this factor, you may consider whether Imagination ignored or sought to benefit or capitalize on George's goodwill and reputation. Companies have an affirmative obligation to avoid creating a mistaken impression regarding the origins of a new product, and to select a mark that is not confusingly similar to one already in use.[89]

While a defendant's bad-faith intent is strong evidence of likelihood of confusion, George need not prove a bad-faith intent on the part of Imagination to establish a likelihood of confusion.[90] If you find that Imagination did not act in bad faith, you should consider this factor neutral.[91]

---

(continued from previous page)
of willful infringement sufficient to justify award of attorney's fees); Paco Sport Ltd. v. Paco Rabanne Perfumes, No. 00-7344, 2000 WL 1721126, at *5 (2nd Cir. Nov. 16, 2000) (while not conclusive, "[f]ailure to request a trademark search or rely on the advice of counsel may indicate bad faith").

[88] V&S Vin & Sprit Aktiebolag v. Hanson, 2001 U.S. Dist LEXIS 24848 at *14, 61 U.S.P.Q. 2d 1277, 1281 (E.D. Va. Oct. 16, 2001); Lone Star, 43 F.3d at 937 (presuming bad faith where defendant opened new restaurant under the plaintiff's mark after receiving notice of plaintiff's rights and after plaintiff commenced its lawsuit).

[89] Selchow & Righter Co. v. Decipher, Inc., 598 F. Supp. 1489, 1499-1500 (E.D. Va. 1984); Lone Star, 43 F.3d at 937; Teaching Company, 87 F. Supp. 2d at 583.

[90] Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245, 1249 (4th Cir. 1970), cert. denied, 400 U.S. 942 (1970) ("While evil intent may evidence unfair competition and deception, lack of guile is immaterial.")

[91] Id.; 3 McCarthy at § 23:107 (explaining that proof of intent to deceive or to confuse is not necessary to prove trademark infringement).

## 2.20   FACTOR 7 - ACTUAL CONFUSION

The seventh likelihood-of-confusion factor is actual confusion.  It is important to bear in mind that George does not need to show *any* instances of actual confusion:  the test under the law is whether there is a *likelihood* of confusion.[92]  Because it is very difficult, and often impossible, to obtain reliable evidence of actual confusion, it is not required.[93]

However, when present, evidence of actual confusion is entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion.[94]

Evidence of actual confusion is relevant not only among consumers, but among wholesalers, retailers, and professional buyers.[95]

You should not infer from the absence of actual confusion that a likelihood of confusion does not exist because various factors may account for the lack of such evidence.[96]  For instance:

1.   Instances of actual confusion may not be readily discoverable because consumers ordinarily do not disclose their state of mind when making purchases.[97]

2.   Many consumers may have been confused without realizing it.[98]

---

[92] Dwight S. Williams v. Lykens Hosiery Mills, 233 F.2d 398, 401 (4th Cir. 1956).

[93] 3 McCarthy at § 23:12; Communications Satellite Corp., 429 F.2d at 1251; Sara Lee, 81 F.3d at 463.

[94] Lone Star, 43 F.3d at 937.

[95] See 3 McCarthy § 23:5 & n.8 (and cases cited therein)

[96] See generally, Richard L. Kirkpatrick, Likelihood of Confusion in Trademark Law, § 7.8 (1997).

[97] Restatement (Third) of Unfair Competition § 23 cmt. d, p.251 (1995).

[98]  Int'l Kennel Club of Chicago v. Mighty Star, Inc., 846 F.2d 1079, 1091 n.6 (7th Cir. 1988); 3 McCarthy at § 23:12.

3.   Those who do later learn of their deception will often not bother to report the fact.[99]

4.   The vast majority of confused persons do not contact either party.[100]

5.   Consumers may be embarrassed and reluctant to admit their confusion or mistake.[101]

6.   Consumers may not know to whom they should complain.[102]

Moreover, if the parties' marks have co-existed in the marketplace for only a short period of time, there may have been little opportunity for actual confusion to occur.[103]  Or if the defendant's product has been sold only in minimal quantities and is not widely available to the consumers at issue, the opportunity for actual confusion to arise will have been lessened. Further, if the products involved are relatively inexpensive, consumers may be unlikely to report complaints.[104]  In these circumstances, the absence of actual confusion is less significant and even a few instances of actual confusion is probative.[105]

---

[99] 3 McCarthy at § 23:12.

[100] Kinark Corp. v. Camelot, Inc., 216 U.S.P.Q. 111, 126 (D.N.J. 1982).

[101] Miles Labs. v. Naturally Vitamin Supplements, 1 U.S.P.Q.2d 1445, 1453 (T.T.A.B. 1986).

[102] Clark, Inc. v. Resnick, 219 U.S.P.Q. 619, 623 (D.R.I. 1982).

[103] 5 McCarthy at 23:18; Centaur Commc'ns, Ltd. v. A/S/M Commucn's, Inc., 830 F.2d 1217, 1227 (2d Cir. 1987) ("The absence of [actual confusion] proof is not especially significant in the present case, particularly given the short time before trial--four months--in which the marks were 'competing.'").

[105] Ambrit Inc. v. Kraft Inc., 805 F.2d 974, 987 (11th Cir. 1986) (four instances of confusion are sufficient where the products are inexpensive and consumers are less likely to complain)

## 2.21    FACTOR 8 - QUALITY OF DEFENDANTS' GOODS

The eighth likelihood-of-confusion factor is the quality of Imagination's goods.

Consideration of the quality of the defendant's product is most appropriate in situations

involving the production of cheap copies or knock-offs of a competitor's trademark-protected

goods.[106]   Otherwise, this factor is irrelevant.

---

[106] <u>Sara Lee Corp.</u>, 81 F.3d at 467.

## 2.22   FACTOR 9 - SOPHISTICATION OF CONSUMERS

The ninth likelihood-of-confusion factor is the sophistication and degree of care exercised by the parties' consumers.  The less care exercised, the greater the likelihood of confusion.

The prices of the parties' games is important in determining the amount of care a reasonably prudent purchaser will use.[107]   If you find the parties' games are inexpensive such that consumers would likely not devote a great deal of time and attention to making purchasing decisions, such finding weighs in favor of a likelihood of confusion.[108]

The parties agree in this case that retail sales of their respective games are primarily impulse purchases.[109]

---

[107]  3 <u>McCarthy</u> at 23:95.

[108]  <u>Heidi Ott A.G. v. Target Corp.</u>, 153 F. Supp. 2d 1055, 1066 (D. Minn. 2001).

[109]  Docket No. 71 at ¶ 53.

## 2.23    CYBERSQUATTING

George also claims Imagination has engaged in "cybersquatting" by registering and using the domain names "lcr.tv," "leftcenterright.tv," "leftcenterrightdice.com," "leftcenterrightgame.com," and "leftcentreright.com" after Imagination was aware of George's trademark rights.  The federal Anticybersquatting Consumer Protection Act prohibits the registration of a domain name that is identical or confusingly similar to a mark owned by another party, where the registrant has a bad faith intent to profit from using the domain name.[110]

---

[110] 15 U.S.C. § 1125(d)(1)(A); <u>People for the Ethical Treatment of Animals v. Doughney</u>, 263 F.3d 359 (4th Cir. 2001).

## 2.24   BAD FAITH UNDER ACPA

To determine whether Imagination had a "bad faith intent to profit" from using the

"lcr.tv," "leftcenterright.tv," "leftcenterrightdice.com," "leftcenterrightgame.com," and

"leftcentreright.com" domain names, you should consider the following non-exhaustive

factors[111]:

1. the trademark or other intellectual property rights of Imagination, if any, in the domain names;

2. the extent to which the domain names consist of Imagination's name or a name that is otherwise commonly used to identify Imagination;

3. Imagination's prior use, if any, of the domain names in connection with the bona fide offering of any goods or services;

4. Imagination's bona fide noncommercial or fair use of the mark in a site accessible under the domain names;

5. Imagination's intent to divert consumers from George's online location to a site accessible under the domain names that could harm the goodwill represented by George's marks, either for commercial gain or with the intent to tarnish or disparage George's marks, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

6. Imagination's offer to transfer, sell, or otherwise assign the domain names to George or any third party for financial gain without having used, or having an intent to use, the domain names in the bona fide offering of any goods or services, or Imagination's prior conduct indicating a pattern of such conduct;

7. Imagination's provision of material and misleading false contact information when applying for the registration of the domain names, Imagination's intentional failure to maintain accurate contact information, or Imagination's prior conduct indicating a pattern of such conduct;

8. Imagination's registration or acquisition of multiple domain names which Imagination knows are identical or confusingly similar to marks of others that are distinctive at the time of the registration of such domain names, or dilutive of

---

[111] 15 U.S.C. § 1125(d)(1)(B)(i).

famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

9. the extent to which the mark incorporated in Imagination's domain name registrations is or is not distinctive and famous

The first four factors, if present, describe circumstances that may tend to indicate an absence of bad faith, while the remaining factors describe circumstances that may tend to indicate such bad-faith intent exists.[112]

There is no simple formula for evaluating and weighing these factors, and you should not simply count up which party has more factors in its favor.[113]  Also, because this list is permissive, you need not consider each and every factor in your determination.[114]

---

[112]  Lamparello v. Falwell, 420 F.3d 309, 318-320 (4th Cir. 2005) (quoting H.R. Rep. No. 106-412, 1999 WL 970519, at *10).

[113]  Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 234 (4th Cir.2002).

[114]  Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264, 269 (4th Cir.2001).

## 2.25   DAMAGES IN GENERAL

I  will now give you jury instructions regarding damages.  This should not suggest to you in any way that one party or the other should prevail in this case.  Instructions regarding damages are given for your guidance, to be used only if you find that the evidence supports finding Imagination liable on one or more of the claims made by George.[115]

---

[115] 2 <u>Jury Instructions in Intellectual Property Cases</u> at 30-8-30.

**2.26    DAMAGES CLAIMED BY GEORGE**

If you find for George on its trademark infringement or unfair competition claims, for any of its asserted marks, you must determine the monetary relief to which George is entitled. George has asked for the following relief:  (1) that Imagination pay George the monetary damages that George sustained as a consequence of Imagination's acts, (2) that Imagination pay George the profits Imagination made from the sales of games bearing the LEFT CENTER RIGHT mark, and (3) that Imagination pay George enhanced damages.  I will now discuss each of these points in turn.

**2.27    ACTUAL DAMAGES**

If you find in favor of George on its trademark and unfair competition claims,[116] you may

award George damages for the amount of money that will reasonably and fairly compensate

George for any injury you find was caused by Imagination's infringement and unfair

competition.[117]

In assessing the amount of actual damages, you may consider:

1.     The injury to and loss of George's goodwill, including injury to and loss of George's general business reputation;

2.     Any lost sales that occurred because someone bought Imagination's LEFT CENTER RIGHT game mistakenly believing it to have been made or licensed by George.

3.     The cost and expense of corrective advertising that George will be required to spend in the future to correct any confusion, mistake, or deception caused by Imagination's activities;[118]

4.     The reasonable royalty rate Imagination would have paid to George if it had licensed George's marks.[119]

5.     Any other factors that bear on George's actual damages.[120]

As noted above, in determining damages, you may consider whether George suffered any

measurable loss to its goodwill.  The goodwill of a company is an intangible business value that

---

[116] 5 <u>McCarthy</u> 30:74.

[117] 15 U.S.C. § 1117(a).

[118] <u>Id.</u>

[119] <u>Sands, Taylor & Wood v. Quaker Oats Co.</u>, 34 F.3d 1340, 1345-46 (7th Cir. 1994), <u>corrected</u>, <u>substituted op. in part</u>, <u>reh'g denied in part</u>, 44 F.3d 579 (7th Cir. 1995) (upholding district court's computation of hypothetical royalty rate for actual damages award).

[120] <u>See</u> 5 <u>McCarthy</u> at § 30:72; 3 Jerome Gilson, <u>Trademark Protection and Practice</u> § 8.08[2] (2001); Ninth Circuit Model Civil Jury Instructions at 18.23.

reflects the basic human tendency to do business with a company that offers a product of the type and quality that a customer desires and expects.  Product quality and a willingness to stand behind the quality of the product sold by a company are all factors in the goodwill of that business. [121]

The goodwill attached to a particular product or business may be symbolized in whole or in part by the public's acceptance and recognition of a trademark or name.  That goodwill is a part of the overall business value, which is the goodwill of the company. [122]

If you find that George's goodwill has been damaged either by injury to the goodwill associated with a particular product or injury to its general business reputation, you may assess such damages as you may find shown by the evidence.  The measure of George's damage is the amount it would take to restore George's goodwill to the same point it enjoyed before Imagination's infringing acts.[123]

Difficulty or uncertainty in ascertaining or measuring the precise amount of any damages does not preclude recovery, and you should use your best judgment in determining the amount of any damages based on the evidence.[124]

---

[121]   See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber, 408 F. Supp. 1219, 1248-49 (D. Colo. 1976), modified, 561 F.2d 1365 (10th Cir. 1977).

[122]   Id. at 1249.

[123]   Id.

[124]   Id. at 1245.

**2.28    PROFITS**

In addition to actual damages, George may be awarded any profits earned by Imagination that are attributable to Imagination's infringement.[125]  George need not show actual confusion to be awarded profits.[126]  An award of Imagination's profits is proper:  (1) if you find that Imagination has been unjustly enriched, or (2) that Imagination acted in bad faith.[127]

The purpose of awarding profits is to compensate the plaintiff for its loss and remove profits from the hands of an infringer.[128]

To establish Imagination's profits, George has the burden of proving Imagination's gross sales only.  It is then Imagination's burden to prove the costs and deductions from gross sales to determine profits.[129]

Costs include operating, overhead, and production expenses incurred in producing the gross revenue for Imagination's game.  George is entitled to the difference between Imagination's gross sales earned from its game and the costs and deductions attributable to that particular game that Imagination was actually able to prove.[130]

---

[125] 15 U.S.C. § 1117(a).

[126] Teaching Co., 87 F.Supp.2d at 589.

[127] Id. at 590.

[128] Id. at 592.

[129] 15 U.S.C. § 1117(a).

[130] Id.

Costs and deductions must be specifically proven with reliable evidence, and must be tied directly to the infringing product.[131]  Overhead figures applied to all of Imagination's products are irrelevant to determining the specific overhead expense incurred for the game at issue.[132]  If Imagination has not presented sufficient evidence to support its claimed expenses, you may, if you so determine, award George the full amount of Imagination's gross sales.[133]

---

[131] Teaching Co., 87 F. Supp. 2d at 591 (holding that defendant did not "sustain its burden of proving the propriety of many of [its] costs and deductions" because defendant's testimony and financial documents indicated "several flaws which render [defendant's claimed costs and deductions] unreliable," such as overstating advertising costs and "allocat[ing] excessive overhead expenses to the infringing products"); 5 McCarthy, McCarthy at § 30:68 (4th ed. 2004) ("If the infringer makes or sells several different brands of goods and only one is infringing, then it must apportion costs to the infringing line.").

[132] See Maltina Corp. v. Cawy Bottling Co., Inc., 613 F.2d 582, 586 (5th Cir. 1980) ("a proportionate share of overhead is not deductible when the sales of an infringing product constitutes only a small percentage of total sales.").

[133] New York Racing Ass'n v. Stroup News Agency Corp., 920 F. Supp. 295, 301 (N.D.N.Y. 1996) (holding that where defendant fails to present any evidence of costs or deductions, "the profits to which the plaintiff is entitled under the Lanham Act are equal to the infringer's gross sales"; court awarded gross sales and trebled them for "flagrant violation" of plaintiff's mark); 5 McCarthy at § 30:66 ("If the infringer provides no evidence from which the court can determine the amount of any cost deductions, there is no obligation to make an estimate, and 'costs' need not form any part of the calculation of profits.").

## 2.29   ENHANCED DAMAGES

The third type of damages you may award are enhanced damages.  Enhanced damages are available under George's Virginia state trademark infringement claim.[134]

Virginia common law allows recovery of enhanced damages where there is misconduct or malice, or such recklessness or negligence as showing a conscious disregard of the rights of others.[135]   The purpose of enhanced damages is to vindicate the plaintiff, punish the wrongdoer and set an example.[136]   The amount of damages "should bear some reasonable relationship to the actual damages sustained and to the measurement of punishment required."[137]

---

[134] 5  McCarthy at § 30:97 (citing Getty Petroleum Corp. v. Island Transp. Corp., 862 F.2d 10, 8 (2d Cir. 1988), cert. denied, 490 U.S. 1006 (1989)).

[135] Vicente v. Obenauer, 736 F. Supp. 679, 695 (E.D. Va. 1990) (citing Baker v. Marcus, 114 S.E.2d 617, 620 (1960)), or "on a showing of willful and wanton conduct which evinces a conscious disregard of the rights of others." Vicente, 736 F. Supp. at 695 (citing Booth v. Robertson, 374 S.E.2d 1 (1988)).

[136] Northwestern Nat'l Cas. Co. v. McNulty, 307 F.2d 432, 435-36 (5th Cir. 1962); Adams v. Hunter, 343 F. Supp. 1284 (D.S.C. 1972), aff'd, 471 F.2d 648 (4th Cir. 1973).

[137] Gazette, Inc. v. Harris, 325 S.E.2d 713, 747 (1985).

## 2.30    DAMAGES UNDER ACPA

If you find Imagination liable under the Anticybersquatting Consumer Protection Act, you should award George damages under that law as well.  George has elected statutory damages as its monetary remedy.[138]  You may award not less than $1,000 and not more than $100,000 for each of the domain names registered by Imagination that you find have infringed any of George's marks.[139]  Those domain names include:  "lcr.tv," "leftcenterright.tv," "leftcenterrightdice.com," "leftcenterrightgame.com," and "leftcentreright.com."

You should decide the just amount to award George, keeping in mind that the purpose of the Anticybersquatting Consumer Protection Act is to both deter wrongful conduct and provide adequate remedies for trademark owners who seek to enforce their rights in court.[140]

Statutory damages are provided as an alternative to actual damages under the Anticybersquatting Consumer Protection Act, and George need not show actual damages to establish cybersquatting or to recover statutory damages.[141]

---

[138] 15 U.S.C. § 1117(d) (a successful plaintiff "may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages…").

[139] Id.

[140] Id.; See S. REP. NO. 106-140, at 8 (1999); see also H.R. CONF. REP. NO. 106-464, at 38 (1999).

[141] FieldTurf, Inc. v. Triexe Mgmt. Group, Inc., 69 USPQ 2d 1861, 1863 (N.D. Ill. 2003).

**2.31    UNCLEAN HANDS**

Imagination has asserted the affirmative defense of unclean hands.  I will now discuss

this defense.

Unclean hands is an equitable defense that can bar a plaintiff from recovering in a

trademark case.  To establish unclean hands, Imagination must demonstrate (1) that George's

conduct was inequitable, (2) that George's inequitable conduct relates directly to the claims

George has asserted against Imagination, and (3) that George's conduct injured Imagination.[142]

In trademark cases, the doctrine of unclean hands must relate to the creation or acquisition of the

asserted trademark itself.[143]

Taking action against infringers, so long as done in good faith, does not constitute

unclean hands.[144]  A trademark owner is entitled to advise others of his trademark rights, to warn

others that they or others are or may be infringing his rights, to inform others that it is seeking to

enforce its rights through legal proceedings, and to threaten accused infringers and their

---

[142]  JTH Tax, Inc. v. H & R Block Eastern Tax Services, Inc., 128 F. Supp. 2d 926, 949-950 (E.D. Va. 2001), vacated and remanded in part on other grounds, JTH Tax, Inc. v. H & R Block Eastern Tax Services, Inc., 28 Fed.Appx. 207 (4th Cir. 2002) (internal citations omitted).

[143] Procter & Gamble Co. v. Quality King Distributors, Inc., 123 F. Supp. 2d 108, 115-16 (E.D.N.Y. 2000); Mytee Prods. v. H.D. Prods., No. 05CV2286, 2006 U.S. Dist. LEXIS 96385, at *23-24 (S.D. Cal. June 22, 2007) ("[W]here unclean hands is raised as a purported defense to a claim of trademark infringement, what is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts.") (citations and internal quotations omitted).

[144]  6 McCarthy at § 31.57 (citing Esquire, Inc. v. Esquire Slipper Mfg. Co., 243 F.2d 540 (1st Cir. 1957) (holding that "[e]fforts to protect trademarks, even aggressive ones, serve the competitive purpose of furthering trademark policies. Where large competitors each represent their respective trademark interests, unless one party is irrational, the result should accord with how the parties view their respective rights").

customers with suit.[145]

---

[145] <u>Leopold v. Henry I. Siegel Co.</u>, 2 U.S.P.Q.2d 1715, 1717 (S.D.N.Y. 1987).

## 2.32   ATTORNEYS' FEES

If you find for the plaintiff on any one of its claims, you must determine whether this is an "exceptional case."  A case is "exceptional" if the defendants' conduct was malicious, fraudulent, willful or deliberate in nature.[146]  In other words, a prevailing plaintiff must show that the defendant acted in bad faith.[147]  In making this determination, you may consider Imagination's intent or willfulness in adopting LEFT CENTER RIGHT[148] and Imagination's clearance practices.[149]

---

[146] Scotch Whisky Ass'n v. Majestic Distilling Co., Inc., 958 F.2d 594, 599 (4th Cir.1991).

[147] Id.

[148] Teaching Co., 87 F. Supp. 2d at 592.

[149] Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 33 (1st Cir. 2002) (finding that the failure to conduct a trademark search was evidence, along with other behavior, of willful infringement sufficient to justify award of attorney's fees).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing to the following:

> Christopher A. Glaser, Esq.
> William F. Krebs, Esq.
> Bean, Kinney & Korman, PC
> 2300 Wilson Blvd., Suite 700
> Arlington, Virginia  22201

> /s/ Monica Riva Talley
> Monica Riva Talley, Esq. (VA 41840)
> FINNEGAN, HENDERSON,
> FARABOW, GARRETT & DUNNER,
> L.L.P.
> 901 New York Avenue, N.W.
> Washington, D.C.  20001-4413
> Tel:  202-408-4000
> Fax:  202-408-4400
> Email:  monica.talley@finnegan.com

> Attorneys for Plaintiff
> George & Company LLC